CITY OF EAU CLAIRE and others, Respondents, vs. WIS-
 CONSIN–MINNESOTA LIGHT & POWER COMPANY,
 Appellant.
CITY OF CHIPPEWA FALLS and others, Respondents, vs.
.          SAME, Appellant.
CITY OF MENOMONIE and others, Respondents, vs. SAME,
     Appellant.

*May 13—October 10, 1922.*

*Public utilities: Judicial interference with order of railroad com-
 mission: Rates: Appeal by users: Power companies: Loop
 system: Utility as unit: Disadvantage to municipality: Va-
 lidity.*

1. The fixing of rates to be charged by a public utility is a com-
plicated problem calling for expert and scientific knowledge,
and the court should proceed with great caution in setting
aside the orders of the railroad commission fixing rates be-
cause of detail errors of judgment.
2. Where the rates to be charged by a public utility are fixed by
the legislature the courts have no power to interfere except
to protect private property from confiscation; and if rates
are fixed sufficiently high to enable the utility to earn a reason-
able return upon the capital invested, there is no ground for
judicial interference.
3. Sec. 1797*m*—64, Stats., providing that any public utility or
any person in interest being dissatisfied with any rates fixed
by the railroad commission may commence an action to set
aside such rates, plainly contemplates that the users as well
as the utility are entitled to a judicial review upon the ques-
tion of whether the rate promulgated is in fact a lawful rate.
4. Where the railroad commission prescribes a rate which yields
more than a reasonable return to the public utility, such rate

is unlawful as to the public, and the court may set it aside upon the complaint of any user adversely affected.

5. Whether or not a city adjacent to a water-power site is to be deprived of the advantage of its location and made to bear the burden of a portion of the expense of carrying power to a distant city is a question of public policy which is for the legislature.

6. Where a group of cities was furnished electric current by the same company, an order of the railroad commission treating the group rather than the individual municipality as the unit in fixing the rates to be charged for the current was erroneous and should be vacated and set aside, in view of statutory provisions which contemplate the serving of only one city by a utility and recognize that portions of a utility may. be situated in different cities.

ESCHWEILER and JONES, JJ., dissent.

APPEALS from judgments of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

These actions were brought by the plaintiffs and respondents to review an order of the railroad commission fixing the rates to be charged by the *Wisconsin-Minnesota Light & Power Company,* a public utility furnishing electrical energy to the plaintiff cities. The cases involve the same facts, were argued together, and will be disposed of in one opinion.

Prior to June 1, 1914, the Chippewa Valley Railway, Light & Power Company owned and operated certain hydroelectric generating plants consisting of two dams on the Red Cedar river. It also operated a dam in the city of *Chippewa Falls* and owned and operated a leasehold interest in the so-called Dells dam located in the city of *Eau Claire.* On that date it was furnishing electric current for lighting and power purposes in the cities of *Menomonie, Chippewa Falls, Eau Claire,* and Altoona, as well as the villages of Elmwood, Spring Valley, and Ellsworth. It had also built a transmission line and was furnishing electric energy to Red Wing, Minnesota. On that date it had under construction a transmission line from Altoona easterly, eight miles, to Fall Creek. It had under consideration the pro-

jection of a line from Ellsworth to Hastings, and had contracted to supply certain Minnesota cities along the Mississippi river from Red Wing to Winona. The plants then owned and operated by it supplied ample power to meet the demands for electric energy by all of the communities then supplied by it or under contemplation.

On June 1, 1914, the *Wisconsin-Minnesota Light & Power Company* acquired all of the stock of the Chippewa Valley Railway, Light & Power Company. The *Wisconsin-Minnesota Light & Power Company* owned the lighting plant at Red Wing, Minnesota, and another at La Crosse, Wisconsin, the power for which was generated by a large steam plant. The property of the Chippewa Valley Company included certain water-power sites on the Chippewa river. After the *Wisconsin-Minnesota Light & Power Company* acquired the stock of the Chippewa Valley Company it entered into a contract with the Consumers Power Company (now the Northern States Power Company) of St. Paul, Minnesota, by the terms of which it agreed to furnish, when it had completed what is now known as the Wissota dam, for a period of thirty years thereafter, 22,000,000 KWH firm power per year, for which it was to be paid five and one-half mills per KWH at the substation at Stillwater, Minnesota. It further agreed to furnish a like amount of surplus power each year for which it was to be paid three mills per KWH. This current was to be delivered over a power line seventy-four miles in length, now known as the St. Paul High Line, reaching from the proposed Wissota dam to the St. Croix river opposite Stillwater, Minnesota. Having secured this contract, it made application to the railroad commission for a permit to build the Wissota dam, which permit was granted. The estimated cost of the proposed dam and the St. Paul High Line was $3,000,000. However, the project was completed at an expense of approximately $7,000,000.

The contract proved to be unprofitable. The company could not earn a reasonable return on its investment under

the terms of the contract with the Northern States Power Company. This contract was changed in May, 1917, by supplemental agreement, by which the *Wisconsin-Minnesota Light & Power Company* was obligated to furnish under the contract all power "not needed elsewhere." The *Wisconsin-Minnesota Light & Power Company* then apparently started on a campaign to procure a larger market, for the power generated by the Wissota dam, from Wisconsin cities. At the time of the order of the commission under review, October 9, 1920, it was furnishing power or current to Alma, Alma Center, Altoona, Augusta, Boyd, Bloomer, Cadott, *Chippewa Falls,* Cochrane, *Eau Claire,* Elk Mound, Ellsworth, Elmwood, Fairchild, Fall Creek, Humbird, Hixton, La Crosse, *Menomonie,* Mondovi, Neillsville, Nelson, Rusk, Spring Valley, Stanley, Thorp, Taylor, Eleva, Woodmore, Plum City, Blair, Whitehall, and Independence, in Wisconsin, as well as to the following Minnesota cities: Hastings, Frontenac, Lake City, Red Wing, Wabasha, Kellogg, Winona, La Crescent, and Hoka. The cities originally furnished by the Chippewa Valley Company, as well as those furnished at the present time, constitute what is called a Loop System. It will be seen that the Loop System has been substantially enlarged since the construction of the Wissota dam and numerous communities have been added thereto.

Prior to October 9, 1920, the *Wisconsin-Minnesota Light & Power Company* applied to the railroad commission for an increase in its rates of service, resulting in the order permitting an increase of rates of which the plaintiffs complain.

In fixing the rates the railroad commission treated the Loop, that is, all the cities furnished and supplied by the *Wisconsin-Minnesota Light & Power Company,* as a unit. It divided the cities in the Loop into classes, placing *Chippewa Falls, Eau Claire,* and La Crosse in one class, *Menomonie* and Red Wing in another class, and all other

cities or villages in a third class. It also divided the individual consumers into classes, but, aside from such classification, all municipalities and all consumers were regarded as a unit. The city of La Crosse, located at least 100 miles from the Wissota dam, was given the same rates as *Eau Claire* and *Chippewa Falls,* located in close proximity thereto. No consideration was given to the proximity of any community to the dam, although it is apparent that to supply a distant community a power line is required, incurring additional investment as well as a loss of power in the course of transmission. The commission estimated that the plants originally operated by the Chippewa Valley Company were presently unable to supply the demand for power coming from the present Loop, owing to the addition of various municipalities thereto, as well as perhaps an increasing demand for power in the municipalities originally supplied by the original developments; that the requirements of the present Loop System for firm or constant power absorbed all of the firm or constant power generated by the original developments as well as 71.68 per cent. of the firm or constant power generated by the Wissota dam. In computing the investment chargeable to the Loop System, 71.68 per cent. of the cost of the Wissota dam was therefore apportioned to the Loop System.

In the lower court the appealing municipalities complained of the allocation of 71.68 per cent. of the cost of the Wissota dam to the Loop and strenuously maintained that the commission had no right to regard the Loop as an entity in fixing the just and reasonable rates for service.

The lower court held that the action of the commission in treating the Loop as an entity was lawful. It held, however, that an unreasonable proportion of the cost of the Wissota dam was apportioned to the Loop and for that reason reversed the order of the commission. From the judgment so entered the *Wisconsin-Minnesota Light & Power Company* appealed.

For the appellant there were briefs by *Olin, Butler, Thomas, Stebbins & Stroud* of Madison, attorneys, and *Charles McPherson* of Grand Rapids, Michigan, of counsel, and oral argument by *Mr. H. L. Butler* and *Mr. McPherson.*

For the respondents there were briefs by *John R. Mathews,* attorney for the *City of Menomonie, J. B. Fleming,* attorney for the *City of Eau Claire,* and *L. J. Rusk,* attorney for the *City of Chippewa Falls,* and *Bundy, Beach & Holland* of Eau Claire, of counsel; and the cause was argued orally by *Mr. C. T. Bundy, Mr. P. M. Beach,* and *Mr. Fleming.*

On behalf of the *Railroad Commission* as *amicus curiæ* there was a brief by the *Attorney General* and *Ralph M. Hoyt,* deputy attorney general.

The following opinions were filed July 8, 1922:

OWEN, J.   While the lower court reversed the order of the commission principally for the reason that an undue proportion of the investment made in the Wissota dam was charged to the Loop and used as a basis for fixing the reasonable rates to be paid by the users of electric current situated on the Loop, we deem it unnecessary to review the finding of the lower court in that respect for the reason that our decision will be placed upon a broader and more fundamental consideration.   We deem it proper to suggest, however, that a court should proceed with great caution in setting aside the orders of the commission fixing rates, for what may be considered detail errors of judgment.   The fixing of rates is a complicated problem, calling for expert and scientific knowledge.   The rate promulgated by the commission is generally the result of mature consideration on the part of those having expert and technical knowledge which is essential in arriving at just and correct conclusions.   The announcement of the commission should be accorded the greatest deference by the courts, and its orders should be set aside because of presumed errors of judgment or technical computation, with great caution and reluctance.

Eau Claire v. Wisconsin-Minnesota L. & P. Co. 178 Wis. 207.

Speaking of the elements entering into the valuation of public utilities under the statute providing for their purchase by municipalities, it was said in *Oshkosh W. W. Co. v. Railroad Comm.* 161 Wis. 122 (152 N. W. 859), at p. 127:

"It is because the valuation of a utility cannot be reduced to absolutely fixed rules, or to the mere appraisal of parts whose sum equals its value, that the subject is one upon which honest and competent men differ. In the last analysis it is the exercise of a sound and competent business judgment upon many elements of uncertain and debatable value considered as a business entity. Hence grave errors in arriving at and seriously affecting the final result must be shown before a valuation of the commission can be set aside."

That is also applicable to the fixing of rates, which probably involves more technical and expert knowledge and greater exercise of judgment than does the mere matter of the valuation of the utility. These remarks are made merely for the purpose of suggesting the attitude in which we should approach the ruling of the trial court did we consider it material to the disposition of the case.

We may state at the outset that we are deeply impressed with the thought that the fundamental basis upon which the commission proceeded in fixing the rates of which the plaintiff cities complain results in great injustice to those cities and communities originally served by the Chippewa Valley Railway, Light & Power Company. Long before the Wissota dam was built those communities were being adequately and economically served. As a result of the basis adopted by the commission they are now charged a higher rate to enable cities brought into the Loop to enjoy a service at a lower rate than that at which they otherwise could be served. The Wissota dam would never have been built originally for the service of the Wisconsin municipalities which now receive power therefrom. Its construction was

prompted by the contract which it secured from the Northern States Power Company. Had that contract proved a profitable one it safely may be assumed that the utility company would not have sought the market afforded by the various cities and villages which it has added to the original Loop System. This it has done until the original development of the Chippewa Valley Railway, Light & Power Company is insufficient for the demands of the Loop System as so enlarged and extended. This makes necessary a draft upon the power generated by the Wissota dam for the service of the entire Loop System. The latter development was not economical. Its actual cost was, in round numbers, somewhere near double the original estimate. By treating the Loop System as a unit, the cities originally furnished by the prior developments are now called upon to bear the burden necessary to yield a reasonable return upon approximately seventy per cent. of the cost of constructing the Wissota dam. No further elaboration is necessary to enable an appreciation of the grievance entertained by the complaining municipalities. The practical result of the development of the Wissota dam has been to materially increase the cost of service to the original cities of the Loop.

While the hardship resulting to these cities is apparent, the question of whether the basis adopted by the commission resulting in such increased rates is illegal or unreasonable is not so easy of solution. In approaching this subject we should keep in mind the fact that the regulation of rates is exclusively a legislative function. Rates fixed by the legislature cannot be interfered with by the courts except for the purpose of protecting private property from confiscation. If the rates are fixed sufficiently high to enable the utility to earn a reasonable return upon the capital invested, there is no ground for judicial interference. *Madison v. Madison G. & E. Co.* 129 Wis. 249, 108 N. W. 65. See, also, note in Public Utility Reports, 1918B, p. 28. The reason is that the legislature represents the

public, and the public is bound by the action of its representatives in such respect. The remedy of the public in case rates are fixed too high is to elect a legislature that is more considerate of the public interest. The question of how far the courts can go in setting aside an order of a rate-making body created by the legislature upon the complaint of the public has not frequently been before the courts. A note to be found in 12 A. L. R. at page 404 probably collects the great majority, if not all, of the cases bearing upon this subject. A consideration of those cases indicates that courts have quite generally taken the position that such bodies are agencies of the legislature created to protect the public interest and that the public is bound by their decisions.

But our Public Utility Law, sec. 1797$m$—64, Stats., expressly provides that

"Any public utility and any person or corporation in interest being dissatisfied with any order of the commission fixing any rate or rates . . . may commence an action in the circuit court for Dane county against the commission as defendant to vacate and set aside any such order on the ground that the rate or rates . . . fixed in such order is . . . unreasonable."

This plainly contemplates that the users as well as the utility are entitled to a judicial review upon the question of whether the rate promulgated is in fact a lawful rate. We therefore conclude that the complaining cities are entitled to a judicial review upon the question of whether the rate promulgated by the commission is in fact a lawful rate.

Manifestly, whether it is a lawful rate depends upon whether it is a rate which the commission is authorized to prescribe pursuant to legislative authorization. It is obvious that the commission has no power except such as is expressly or by inference conferred upon it. And here we may remark that what is a lawful rate is not very specifically defined by the legislature. It simply says that all rates should be reasonable, and authorizes the commission to ascertain the

reasonable rate for a given service. This is most general and indefinite. Courts have defined a reasonable rate when the question was raised upon the complaint of the utility. It is a rate which assures the utility a reasonable return upon the money invested. But what is a reasonable rate so far as the public is concerned has not been the subject of frequent judicial treatment. It is plain that a rate prescribed by the legislature higher than that necessary to give the utility a reasonable return upon the money invested could not be judicially annulled. We believe, however, that the legislative command to the commission to ascertain the reasonable rate contemplates such a rate as would be held not confiscatory upon the complaint of the utility, and that the public has a right to complain of any rate which yields to the utility more than a reasonable return. This is upon the theory that the legislature has in general terms prescribed but one rate: *i. e.* a reasonable rate—the rate which yields to the utility a reasonable return upon the money invested. If, therefore, the commission prescribes a rate which yields more than a reasonable return to the utility, it has violated the legislative command, and it not only is within the power, but is the duty, of the court to set such rate aside upon the complaint of any user adversely affected.

But in this case there is no contention that the rates fixed yield an unreasonable return to the utility. The complaint is that the return to, or income of, the utility resulting from the rates fixed by the order under review is unlawfully and unreasonably distributed among the municipalities constituting the so-called Loop System. This brings us down to the single question of whether the commission was acting within the legislative command in treating the Loop System as a unit for the purpose of fixing the rates to be charged by the *Wisconsin-Minnesota Light & Power Company.*

This question does not find its answer in any express provision of the statutes. It must be deduced from a consideration of many co-related statutes in conjunction with

the history of commercial, economic, and political develop-
ment. At the time of the enactment of the Public Utility
Law, as well as now, the individual municipality was charged
with the distinct duty of furnishing public utility service,
whether it be light, heat, power, or water, to the inhabitants
of that city, and was then, as now, endowed with ample
power to perform that duty. Practically every municipal-
ity in the state had its individual public utility, whether it
was for the supply of water, gas, or electricity. Its relation
to that utility was a matter of individual dealing between the
municipality and the utility. There was no great develop-
ment of water power by a single utility serving numerous
municipalities scattered far and wide. Our present-day
developments could not have been within the contemplation
of the legislature, because they did not exist.

The legislature enacted a law calculated to bring about
reasonable rates and adequate service between the public
utility on the one hand and the municipality and its inhabi-
tants on the other. Although these large developments of
water power, of which probably the appellant is the most
notable example, have come since the passage of the utility
law, there has been no modification of that law, which we
must assume was enacted in the light of conditions then
existing, which regarded the municipality as the entity on
the one hand and the utility as the entity on the other, for
the purpose of establishing just and reasonable rates and
service. Now, as then, municipalities have the right to
grant franchises to public utilities on certain conditions, to
take over the property of a public utility used and useful in
serving such city, thereby terminating the existing franchise,
and thereafter operate the same as a municipal plant; to
require the utility to make extensions of its lines within the
municipality; to determine the given character of the prod-
uct furnished, and to provide penalties for noncompliance
with municipal ordinances. All this appears from a con-
sideration of the following statutory provisions: sub. (34),

sec. 925—52, secs. 925—96, 925—97, 925—97a, 926—11, 927—1, 940b, 940d, 959—48, 959—49, 959—51, 959—52, 926—128, 926—139, sub. 7, sec. 1778, and sec. 1780b. As stated in respondents' brief:

"It is inconceivable that the legislature intended to recognize the municipality as the unit in all matters pertaining to the furnishing of light and power to its inhabitants, and then authorize the commission to make rates based, in whole or in part, upon the average cost of serving any class of consumers located in forty different municipalities within and without the state, without reference to municipal boundaries."

This principle underlies the decision in *State ex rel. Wis. T., L., H. & P. Co. v. Circuit Court*, 162 Wis. 234, 155 N. W. 139, where it was held that the city of Menasha could condemn the plant of a public utility within the city irrespective of the fact that it was owned and operated in conjunction with utilities in other cities. It is not inconsistent with *Milwaukee E. R. & L. Co. v. Railroad Comm.* 171 Wis. 297, 177 N. W. 25, where it was held that the reasonableness of a street-railway rate upon a system of urban and suburban railways in and about the city of Milwaukee was to be tested by its effect on the entire system operated by the public utility. In that case the utility was serving one contiguous, compact community and not many communities scattered far and wide, having no relations with one another.

In reaching the conclusion that the commission was within the legislative command in treating the entire Loop System as a unit, the lower court relied upon the following statutory provisions: sec. 1797m—1, which defines a public utility as the corporation that owns the plant; sub. 2, sec. 1797m—6, secs. 1797m—12, 1797m—76, and 1797m—78, which seem to recognize the fact that parts of the same utility may be situated in different municipalities. While these statutes do recognize the fact that parts of the same utility may be sit-

uated in different municipalities, they evidently refer to plants which, while located without, develop power and furnish service to, a particular municipality. This is evidenced by sec. 1797*m*—78, which provides:

"Any public utility accepting or operating under any license, permit or franchise hereafter granted shall, by acceptance of any such indeterminate permit be deemed to have consented to a future purchase of its property actually used and useful for the convenience of the public by the municipality in which the major part of it is situate for the compensation and under the terms and conditions determined by the commission, and shall thereby be deemed to have waived the right of requiring the necessity of such taking to be established by the verdict of a jury, and to have waived all other remedies and rights relative to condemnation, except such rights and remedies as are provided in sections 1797*m*—1 to 1797*m*—109, inclusive."

This plainly contemplates that the major portion of any utility contemplated by the act is located in some one municipality. It certainly was not within the legislative contemplation that the only municipality on the Loop served by the Wissota dam that can become the owner of the utility within its municipal borders is the one in which the dam is located, as that no doubt constitutes the major portion of the utility.

We are not unmindful of the considerations of public policy which support the position of the railroad commission; nor of the fact that the utility commissions of other states have adopted the same basis for rate-making under similar circumstances. We are indebted to appellant's brief for the following citations from the Public Utility Reports where public utility commissions have held that under similar circumstances it is impracticable to fix a rate for each separate municipality, and that it is necessary to treat the various municipalities served as a unit for the purpose of fixing rates: *Purchasers of Gas v. Empire G. & F. Co.* P. U. R. 1920A, p. 702 (N. Y.) ; *Glenview Imp. Club v.*

*People's W. Co.* P. U. R. 1918F, p. 187 (Cal.); *Re Mount Whitney P. & E. Co.* P. U. R. 1920D, pp. 931, 936 (Cal.); *In re Rockland E. Co.* P. U. R. 1915D, pp. 683, 688 (N. J.); *Ben Avon Borough v. Ohio Valley W. Co.* P. U. R. 1917C, pp. 390, 419, 420 (Pa.); *Re Chesapeake & P. Tel. Co.* P. U. R. 1921B, pp. 97, 116, 117 (W. Va.); *Newcastle v. Bell Tel. Co.* P. U. R. 1921B, pp. 378, 380, 381; *Re Missouri G. & E. S. Co.* P. U. R. 1921D, p. 687; *Re Utah P. & L. Co.* P. U. R. 1921C, pp. 294, 311.

Our water powers are no doubt an asset to our state. It is no doubt wise that when a water-power site is developed that it be developed to its full capacity. It is probably true that in the great majority of instances a market for the power cannot be found adjacent to, or within convenient distance of, the water-power site, and that in order to find a market for the developed power it will be necessary to conduct the same by transmission lines to distant cities. Whether or not a city adjacent to the power is to be deprived of the advantage of its location and made to bear the burden of a portion of the expense of carrying it to a distant city is a question of public policy which should properly be decided by the legislature. It should not be established either by the railroad commission or by the court. If the legislature shall conclude that the policy adopted by the railroad commission is a wise one, it will be for those administering the law to follow it. As to the wisdom of the policy we intrude no opinion. We simply say that when such policy becomes the policy of the state it should be by legislative declaration, and that declaration has not as yet been made. Under existing statutes the commission is required to treat the municipality as a unit and to base its rate upon the cost to the utility of serving the individual municipality rather than the average cost of serving many distinct and scattered municipalities. Because the commission, in fixing the rates under review, treated the Loop System, rather than the individual municipality, as the unit, it pro-

ceeded upon an erroneous fundamental basis, and its order must be vacated and set aside.

*By the Court.*—The judgments are affirmed.

ESCHWEILER, J. (*dissenting*). The net result of the majority opinion seems to be that in an attempt to drive the good ship Railroad Commission away from roaring Scylla it is now headed, with all sails set, straight for roaring Charybdis.

Possibly much of the difficulty that is here presented is due to a lack of proper co-ordination between the statutory regulation of public utilities and that of water powers. In 1905 and 1907 was inaugurated the era of strict control and regulation of public-service corporations. From that time on no steam railroad could lay a mile of new track, either main, branch, or extension, without having first obtained from the railroad commission a certificate that such was required as a public convenience and necessity. Secs. 1797— 39, 1797—44, Stats. No new service could be inaugurated by any other form of public utility until a similar certificate had been had as to public convenience and necessity. Sec. 1797*m*—74.

Until 1911 it had been the established public policy of this state to recognize that the possibilities of harnessing the water powers in navigable streams in this state subject to the right to them as common highways reserved to the people by the Ordinance of 1787, art. 4, and our constitution, sec. 1, art. IX, was recognized as a legitimate subject of private ownership and vested in him who owned the banks of such stream. He had as to such the same right to contract as to the wheat that he raised in his fields. In 1911 a wide departure from such policy was attempted by the Water Power Act of that year. This act was held an invasion of such property rights under the constitution. *Water Power Cases,* 148 Wis. 124, 134 N. W. 330. The amendment of 1913 was also held unconstitutional because omit-

ting any provision for judicial review as to the proposed taking of such private property. *State ex rel. Owen v. Wisconsin-Minnesota L. & P. Co.* 165 Wis. 430, 162 N. W. 433.

Finally, in 1915, by ch. 380 of that year, now ch. 31, Stats., quite complete control and regulation of all the water powers of this state was assumed by the legislature and to be administered by the already established railroad commission, and no question is here raised as to its validity.

It is important to notice that no provision is attempted to be made in the Water Power Act requiring a showing that public convenience and necessity requires any proposed dam before it may be lawfully constructed. The only time when such a certificate is a condition precedent is when an existing dam is proposed to be purchased by an existing public utility. Sec. 31.15, Stats. That the scope of investigation by the railroad commission as to applications to construct new dams or operate and maintain existing dams is more limited than those required as to other utilities as above quoted, is shown by secs. 31.05 to 31.08, Stats., inclusive.

No question is or can be raised but that the theory of the right of the legislature to assume such wide control and disposition of the water powers of the state is because of the interest the state as a whole has in the navigable waters of the state. This is a right vested in the entire people of the state as a class. In *Rossmiller v. State,* 114 Wis. 169, 187, 89 N. W. 839, it was held that the right of the people of the state at large as such a class to cut ice on navigable waters could not be destroyed by a taxation which had the purpose or effect of the destruction of such right. It was further recognized in denying the right of a proposed drainage district near the Rock river to impair any of the substantial natural features of the river or its navigation. *In re Horicon D. Dist.* 136 Wis. 227, 235, 116 N. W. 12. See, also, *In re Dancy D. Dist.* 129 Wis. 129, 140, 108 N. W. 202. There can therefore be no foundation for the

assertion by any particular individual or any particular community to any preference whatsoever over another individual or municipality on account of geographical proximity to that which exists by reason of the state, as trustee for the people, assuming to regulate or control the water powers on navigable streams.

The majority have determined that the railroad commission acted contrary to the legislative command in treating the Loop System, that is, all the communities served with light and power on wires running from the Wissota dam, as a unit for rate-fixing purposes, and that the respective municipalities instead are such a rate-making unit. It is frankly conceded that there is no express or direct statutory language for such conclusion, and I think there is no support for it by implication.

It is stated by the majority opinion, and we all agree, that there is but one reasonable rate for the service rendered by the public utility here in question. What such existing one reasonable rate is, when translated into concrete form in dollars and cents, is for the railroad commission to determine as an administrative question. *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 163, 164, 116 N. W. 905.

Although the statutes do not expressly so provide, yet it is recognized as law and is so stated in the majority opinion that such reasonable rate must be the one which shall assure the utility a reasonable return upon the money invested. There can be no dispute as to this. *Smith v. Railroad Comm.* 169 Wis. 547, 553, 173 N. W. 312; *Lincoln G. & E. L. Co. v. Lincoln,* 250 U. S. 256, 267, 268, 39 Sup. Ct. 454. But such reasonable rate is not to be measured by a rate which stops just short of confiscation of the property of a utility, as seems to be the idea expressed in the majority opinion. A rate which does amount to confiscation is for that reason unreasonable, but it by no means follows that a rate stopping just short of such confiscation is necessarily

to be deemed a reasonable rate; it is so held in *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 166, 167, 116 N. W. 905, *supra.*

The standard, therefore, for the establishment of rates by which the railroad commission must be governed in dealings between a public utility on the one hand and such of the state or public at large, either as municipalities or individuals, receiving service from such public utility on the other hand, must be the rate which will afford such a reasonable return to such public utility. If such rate is or seems to be unreasonable or excessive so far as the particular wants of any particular community or individual are concerned, the remedy is to obtain such service, if possible, from some other utility or by acquiring his or its own utility, as is expressly provided for in sec. 1797*m*—74, Stats. But there cannot well be two distinct units for rate-making purposes in such a situation as is here presented. It involves contradiction in terms. If each of the plaintiffs here is to be held as an independent unit for rate-making, then of course each of the other communities served must also be considered a separate unit, and hopeless confusion will be the result. To take a burden from one pair of shoulders, as will be done by the majority opinion, will necessarily place the same burden upon other shoulders, for the same burden must be carried somewhere. In my judgment the paramount unit for such purpose is clearly the utility.

By sec. 1797*m*—5 provision is made for the commission valuing all the property of every public utility actually used and useful for the convenience of the public. Such valuation is one of the elements to be considered in the fixing of the rates. The public there referred to can hardly mean less than the public at large as found in all of the several municipalities with which the utility deals. The broad scope to be given to the term "public utility" as found in sec. 1797*m*—1 is discussed fully in the case of *Calumet S. Co. v. Chilton*, 148 Wis. 334, 347, 135 N. W. 131; that case also

holding that for the rights and privileges surrendered or taken a new privilege or monopoly (with former odious coloring extracted) is substituted (p. 358), and also indicating that there was no restricted field intended even in the earlier days, saying (p. 364), "service to the public in the aggregate as well as in individual capacities was unmistakably included." Having taken away from such public utility the right to make contracts for service at such rates and terms as might be agreed upon, the state has plainly declared that the rates which are to be fixed shall be measured by but one yardstick, and that is the one affording a reasonable return to the utility which has thus surrendered or lost its right to contract as such individual or unit. Such arrangements for rates are subject to change with changing conditions, but the standard does not and is not intended to vary.

Nowhere in the Public Utility Law is there evident any intention that such utility shall be dealt with in fragments or shall be limited in its service to but one municipality, nor can it be said that the permit to develop a water power under sec. 31.04, Stats., is limited to any single municipal service.

Manifestly the whole scope and purpose of the water-power legislation is an emphatic negation of the idea that the utilization of the white-coal power of this state is upon the theory of the existence of the right to any special or particular advantage in any particular community or sets of individuals. It can consistently only be based upon the idea that the state is now controlling the making of contracts for services to be rendered for a *quid pro quo* as a trustee for all and not a few only of the people, and that the small and remote community within the radius of the commercially possible extension of the electrical energy developed under state control and regulation is entitled to equal consideration with the larger or nearer communities. This is further emphasized by the provision found in sec. 31.27,

Stats., of the Water Power Act, giving the commission the power to declare any or all contracts entered into by such a water-power company for sales without the state of Wisconsin to be null and void if improvident. So that if there be, by reason of such contracts, an improper burden placed upon the people of this state, it is the legislative declaration that for the benefit of the people of this state such contracts may be declared null and void.

If the theory adopted by the majority opinion is the proper one as to water power, there would seem to be no reason why it would not be equally applicable as to steam railroads and all other utilities. Then particular communities or those interested in particular commodities could insist on the same idea of adjustment of rates to be measured solely by the value of the service to such particular communities or such particular commodities instead of upon what is universally recognized as the basis for the fixing of reasonable rates as to railroad and other utilities, namely, the consideration of the service as a whole and of the utility as a whole rather than of the particular service or particular community as the unit. The attempt by North Dakota to fix a rate for coal based upon such idea was denied in *Northern Pac. R. Co. v. North Dakota,* 236 U. S. 585, 599, 35 Sup. Ct. 429. The same idea as to separation was expressly denied in *Milwaukee E. R. & L. Co. v. Railroad Comm.* 171 Wis. 297, 177 N. W. 25, citing and following *Puget Sound T., L. & P. Co. v. Reynolds,* 244 U. S. 574, 581, 37 Sup. Ct. 705. The present holding evidently affects a substantial part of the business of the utility. It ought not to be required, and cannot be compelled, to carry it on at a loss. *Brooks-Scanlon Co. v. Railroad Comm.* 251 U. S. 396, 399, 40 Sup. Ct. 183.

It seems clear to me that the result of the majority decision is to permit the plaintiffs in this case to accomplish by judicial approval an effect exactly similar to that attempted but condemned in *Kilbourn City v. Southern Wis.*

*P. Co.* 149 Wis. 168, 135 N. W. 499.  Although in that case there is no express mention made of the fact that the water-power company there involved was serving other patrons than those of the city of Kilbourn, yet there can be no question from the facts there shown, and we may well take judicial knowledge of it as a fact, that such power company was rendering and contemplating rendering service to a large number of consumers other than that village.  In that opinion (p. 180) it is stated:

"The village of Kilbourn is one of the patrons of the defendant that is entitled to receive the same consideration in the matter of rates of charge that any other patron is entitled to receive; no less, no more. . . . It is in the same situation that any private riparian owner would be who thought he had an opportunity to drive a hard bargain."

There the village of Kilbourn had all the advantages as against the water-power company there involved that the plaintiff cities in this case have as against the present water-power company, and more.  Yet it was there held that under the idea of the Public Utility Law no preferences by one community over another could be claimed, and though the question of rate-making was not in that case, yet in a measure the same fundamental principles were involved as here.

It may well be that the classification made by the commission was improper and resulted in throwing an unwarranted burden, therefore, upon the plaintiffs, but as but one question is disposed of by the majority I confine myself to that one only.

I am authorized to say that Mr. Justice JONES concurs in this dissent.

A motion for a rehearing was denied, with $25 costs, on October 10, 1922.