## WABASH VALLEY ELECTRIC CO. v. SINGLETON et al.

No. 1178.

District Court, S. D. Indiana, Indianapolis Division.

Feb. 26, 1932.

S. C. Kivett, of Martinsville, Ind., and Glenn Van Auken and Fesler, Elam & Young, all of Indianapolis, Ind., for plaintiff.

James M. Ogden, Atty. Gen., and Pickens, Davidson, Gause, Gilliom & Pickens, of Indianapolis, Ind., for defendants.

Before SPARKS, Circuit Judge, and BALTZELL and SLICK, District Judges.

BALTZELL, District Judge.

This is an action in which the plaintiff, an Indiana corporation, is seeking to enjoin the defendant, Public Service Commission of Indiana, from the enforcement of an order wherein a schedule of rates was fixed by it for electricity furnished by plaintiff to the city of Martinsville, Ind., and the inhabitants thereof. Other defendants, aside from the individual members of the Public Service Commission, are Harry G. Leslie, Governor of the state of Indiana, and James M. Ogden, Attorney General of the state of Indiana. The city of Martinsville was permitted to intervene and file an answer in which it sought to sustain the schedule of rates, as fixed by the commission.

The city of Martinsville has approximately five thousand inhabitants, but it has few industries that consume a large amount of electricity. A great portion of the electricity used is for domestic purposes. For a number of years the city was supplied with electricity by a local plant which was later purchased by plaintiff and is now owned by it.

In keeping with the general progress of the times, plaintiff, which is affiliated with other electric companies, purchased the electric light plant in the city of Martinsville, together with the local plants in the cities of Sullivan, Clinton, and many other cities throughout Central and Western Indiana. It then began the construction of high-tension lines, and to operate an interconnected system of electric plants throughout such territory, comprising the following thirteen counties: Sullivan, Greene, Owen, Clay, Vigo, Parke, Putnam, Morgan, Fountain, Warren, Montgomery, Vermillion, and Tippecanoe. In order that its patrons might be properly served, plaintiff constructed a loop extending through each of the counties supplied by it with electricity. In the event the line in one part of the loop becomes disabled, current is furnished through the other part thereof, thus more nearly assuring current at all times. Current to supply its patrons, through this "loop system," is purchased in part from other utilities and in part supplied by the local plants owned by plaintiff. After the purchase of the local plants, however, the electricity generated by such plants ceased to be used for consumption by the locality in which such plants were situated. They were connected directly with the loop, and, combined with that furnished by other local plants and purchased from other utilities, provide electricity for the municipalities, as well as the industrial plants, coal mines, etc., located outside thereof, within such counties.

The thirteen counties furnished with electricity comprise a greater part of the Indiana coal fields, and at the time plaintiff began its operation in these counties the coal mines were being operated extensively, requiring a great amount of current for such operation. Since that time, however, many coal mines have ceased operation, and the use of electricity in this industry has materially decreased. At the time plaintiff began its operation in these counties, practically all of the municipalities were being supplied by local plants, there being no interconnecting lines, and such plants being owned by either the municipalities themselves or by private corporations. This practice has gradually been abandoned, and at the time of the filing of this suit most of the municipalities in such counties were being supplied by this plaintiff. In fact, electricity is furnished to approximately fifty municipalities within such counties and to numerous industrial plants and individuals not within the corporate limits of any municipality.

In order that current may be furnished at a minimum cost, a large generating plant, known as the "Dresser Plant," was con-

structed on the Wabash river, near the city of Terre Haute, Vigo county, Ind., by the Indiana Electric Corporation, which plant has a generating capacity of more than 300,-000,000 K W H per year. The financing of this plant required the assemblage of a group of electric properties throughout the state of Indiana, in order that there might be guaranteed the disposal of a sufficient amount of electricity each year to justify the construction thereof. Consequently, existing electric utilities were acquired by affiliated corporations throughout Indiana, each to be connected with the Dresser Plant in order to assure economical operation. Among the affiliated corporations were the Wabash Valley Electric Company, plaintiff, Attica Electric Company, Colfax Electric Company, Indiana Electric Corporation, Northern Indiana Power Company, Moran Electric Light & Power Company, and the Mulberry Light & Power Company. The current consumed by these affiliated companies, and others not affiliated, aggregated approximately the entire capacity of such plant. Practically the entire amount of stocks, bonds, and other security of these seven companies, in fact, more than 99 per cent. thereof, is owned by the Central Indiana Power Company. These affiliated companies have common officers and common management, although operating separately.

Through the above arrangement, light and power is furnished the city of Martinsville by plaintiff, the greater portion of which is obtained from the Dresser Plant. The plaintiff had on file with the Public Service Commission at all times, subsequent to its agreement to furnish electricity to the city of Martinsville and the inhabitants thereof, a schedule of rates approved by such commission. On the 16th day of March, 1927, seventeen citizens of Martinsville, and patrons of plaintiff, filed with defendant commission a petition seeking a reduction in such rates. Hearings upon the petition were had at various times by the commission, and a final order was entered on the 26th day of January, 1929, effective as of February 1st following, fixing the rates and charges which plaintiff should be entitled to collect from its subscribers in Martinsville. Such order considered the municipality as the unit, in arriving at the schedule of rates. This is the order of which plaintiff complains in this suit, the enforcement of which it is seeking to enjoin, upon the ground that the rates and charges so fixed in such order are not sufficient to yield an adequate return upon plaintiff's property, used and useful, in supply-

ing electricity to such city, its inhabitants and industries. Plaintiff contends that such rates and charges are confiscatory, deprive it of its property without due process of law, and deny it the equal protection of the law in violation of its rights under the Fourteenth Amendment to the Constitution of the United States.

A temporary restraining order, and later a temporary injunction, were issued by this court, enjoining the enforcement of such order. The temporary injunction now in force was issued, however, upon the condition that, in the event it is dissolved and a decree entered upon final hearing sustaining the order of the commission, then the plaintiff is to refund to its customers in Martinsville, or credit to their respective accounts, any sums collected in excess of those which would have been collected under the schedule of rates, as contained in the order in question. Reference was subsequently made to a special master for the purpose of hearing the evidence and reporting same to this court, together with his special findings of fact and conclusions of law. The special master made report, to which plaintiff has filed thirty exceptions. Hearing was had by this court upon such report and exceptions thereto, and subsequently this court has filed its special findings of fact and conclusions of law, in compliance with equity rule 70½ (28 USCA § 723).

■ The first question necessarily presented for determination is the method to be used in determining the value of plaintiff's property, used and useful, in supplying electricity to the city of Martinsville. It is the contention of plaintiff that its electric property and system, as a whole, should be the unit, and that the schedule of rates and charges for Martinsville should be tested by their effect upon its entire net revenue and the relation of such net revenue to the value of its entire used and useful electric property. The defendants contend that the city of Martinsville should be considered as a segregated unit for the purpose of determining its schedule of rates. In fixing the value of plaintiff's property, used and useful, for the supplying of electricity to such city, defendant commission fixed, first, the value of its local property. It next fixed the "gateway" price for all electrical current furnished by it to Martinsville; this being the price allowed for such current at the city limits. In determining this price, it took the average cost per K W H of all current handled by plaintiff through its entire system, and

added thereto an arbitrary amount for depreciation and return. In other words, after determining the value of the local property, used and useful, in supplying electricity for such city, and determining the "gateway" price for supplying same, then defendant commission proceeded to fix a schedule of rates therefor without regard to the effect of such procedure upon the rate of return which plaintiff will realize from its entire system upon the entire value thereof.

In order that a logical and correct conclusion may be reached, concerning the proper method to be used in determining this question, it is necessary to examine the law under which the Public Service Commission is operating. Prior to the year 1913, each municipality, through its officials, was charged with the duty of providing public utility service for such municipality and the inhabitants thereof, and was, under the law, given ample power to perform such duty. Practically every municipality within the state, the size of Martinsville, had a light and power plant, owned either by such municipality or by a private corporation. The schedule of rates was fixed by the municipality, acting through its officials, and dealing with the utility. In order that the responsibility of the fixing of rates, etc., might be removed from local officials and be centered in a body which was to be provided with expert accountants, engineers, appraisers, etc., the Legislature of 1913 enacted the Public Utility Act (Laws Ind. 1913, c. 76), known as the Shively-Spencer Utility Act. At the time of the passage of this act, the development of electrical power plants was in its infancy, as compared with the present day. The one thing that was uppermost in the minds of the legislators, in enacting this legislation, was to bring about reasonable rates and adequate service on the part of the utility, on the one hand, and the municipality and its inhabitants on the other. Provision is made whereby complaint may be made as to the schedule of rates in force by either the municipality, a certain number of citizens thereof, the utility, etc., in the event they are not satisfied with the existing rates; that is to say, the Utility Act gives to either the municipality, the citizens thereof, or the utility itself, the privilege of petitioning the Public Service Commission for an adjustment of rates, etc. Shively-Spencer Utility Act, § 57, Burns' Rev. Stat. 1926, § 12728. Section 9 of this act (Burns' Ann. St. 1926, § 12680) also provides that "the commission shall value all the property of every public utility actually used and useful for the convenience of the public." It is the contention of the plaintiff that this section is a direct mandate to the commission, and that it must, therefore, make a valuation of all its property used in its entire system, as a unit, in order to determine a proper schedule of rates for the city of Martinsville. It is further contended that a reasonable return must be had upon the value of all its property, before the rates at Martinsville can be adjusted. All of its property is not used and useful for the supplying of electricity to such municipality. Much of it is used for other municipalities, industrial plants, etc., with which defendant city is not concerned. This section refers to the property that is used and useful in connection with the furnishing of a utility to any municipality under consideration, in this instance, Martinsville. To give it any other construction would make the very law, which was enacted for the benefit of the municipalities and the inhabitants thereof, as well as for the benefit of the utility, prohibitive, from the viewpoint of the public. It would make it necessary to have all the property of the entire system appraised each time a single municipality, or ten or more of its citizens, petitioned the defendant commission for a revision of its rates. The expense alone, if allowed to be taxed as an operating expense, as contended by plaintiff, would be so great that in many if not every instance it would result in an increase, instead of a reduction in rates.

There has been no change or modification of this act in so far as the above provisions are concerned, and it must therefore be concluded that it was the intention of the Legislature that the municipality should be the unit in determining the just and reasonable rates to be paid any public utility by it and its inhabitants. Many Legislatures have convened subsequent to the passage of this act, but none have seen fit to change or modify it in that particular.

■ Whether any division of the state, other than a municipality, shall be designated as a unit for the purpose of fixing rates for a utility, is a matter of public policy to be exercised by the Legislature. Until that is done, neither the Public Service Commission, nor a court, can consider any other unit than that which is now fixed by the Legislature, namely, the municipality, in establishing a schedule of rates for the services of a utility in such municipality.

The Public Utility Act of Indiana has never been construed in this particular by the Indiana Supreme Court. It is known,

however, that such act is patterned generally after the Public Utility Act of Wisconsin, and many of its provisions are identical. The Supreme Court of that state, in a well-reasoned opinion, held that the Railroad Commission of Wisconsin, which is similar to the Public Service Commission of Indiana, is "required to treat the municipality as a unit and to base its rate upon the cost to the utility of serving the individual municipality rather than the average cost of serving many distinct and scattered municipalities." City of Eau Claire et al. v. Railroad Commission, 178 Wis. 207, 189 N. W. 476, 481.

The special master found the value of plaintiff's property, used and useful, for supplying electricity to defendant municipality, to be somewhat in excess of that as fixed by the commission, but he further found that the schedule of rates, as fixed by the commission, will yield a net income which is a reasonable return upon the value, as fixed by him. This court has approved the finding of the master in so far as the value of plaintiff's property is concerned, and in its special findings of fact filed in this cause has found the value of the local plant at Martinsville to be $102,947, and has found the value of all other of plaintiff's property, which is used and useful in supplying electricity to such city, to be $101,191, a total value of $204,138. If the schedule of rates, as fixed by the commission, is sufficient to yield a reasonable return upon the valuation, as found by this court, then the order of which complaint is made cannot be disturbed, even though the valuation, as fixed by the commission, is much too low. It is the function of the court to determine whether or not the rates, as fixed by the commission, yield such a small return upon the value of plaintiff's property (considering the municipality as a unit) as to amount to confiscation, and thereby violate the Constitution of the United States. Minnesota Rate Case, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 S. Ct. 571, 47 L. Ed. 892.

It is the contention of the plaintiff that the valuation of its property, even though the commission used the proper method, is too low. It is further contended that the schedule of rates provided in the order is insufficient to yield a reasonable return upon the value of its property.

The commission found the value of the local property at Martinsville to be $87,000.

Such property consisted of poles, towers, overhead conductors, transformers, land, etc. This property was appraised by a Mr. Abbet, engineer for the commission, who testified before the master as to the manner in which he fixed the valuation of each particular item. It was also appraised for plaintiff by Spooner & Merrill, a reputable engineering firm. These engineers differ as to the manner in which their appraisals were made, and, consequently, their conclusions vary somewhat. The master heard the testimony of these engineers, as well as the testimony of all of the other witnesses, and is qualified to determine the weight and credit to be given to such testimony. In arriving at his conclusion, as to the value of such property, it is sufficient to say that he considered properly the cost of reproduction new, of all physical property, and fixed its depreciated value at $84,589. To this he added the sum of $3,358 for "Working Capital," the sum of $6,500 for "Material and Supplies," and the sum of $8,500 for "Going Value"; making a total added to the value of the physical property of $18,358. These items are all proper to be considered in determining the value of a utility property for rate-making purposes, and are all that should be considered in this case, in arriving at that value. These items, in general, are computed by experts, found upon well-defined rules and upon experience, yet they are not and cannot be as accurate as an appraisal of something actually in existence. When it is recalled, in the instant case, that an amount in the sum of approximately $18,000 for this purpose is added to the sum of $84,569, the value of the physical property, it would clearly indicate that such amount is sufficient.

An inventory and appraisal of all property, classified as the "power system," was made by both the engineer for the commission and the engineers for plaintiff. This appraisal correctly excludes all local distribution property which is not in any manner used and useful in supplying current to Martinsville. Included in this inventory are three generating plants in their entirety. The appraisal of the engineers again differs in some particulars, and it was necessary for the master to determine the value from all the evidence. The value depreciated at the date of the order of all of plaintiff's physical power system, used and useful for supplying electricity to the public generally, among which was Martinsville and its inhabitants, and exclusive of the value of the local plant,

is $2,124,830. To this was added the following, all of which are proper:

Working Capital.............. $80,000.00
Fuel Stock.................... 5,000.00
Material and Supplies.......... 162,000.00
Going Value.................. 250,000.00

Total .................. $497,000.00

This makes a total value depreciated in the sum of $2,621,830 as of the date of the order. Between that date and the date of the hearing, May, 1930, there had been additional capital added in the sum of $444,565, making the value of the property, at the date of the hearing, $3,066,395.

The question of the method to be used in allocating a proper portion of this value to Martinsville is the next to be considered, and is one that is not free from difficulty. The records of plaintiff disclose the total sales of K W H during each year. Such records also disclose the sales of K W H to the city of Martinsville by plaintiff for the same period of time. Bearing in mind the fact that the plaintiff is only a distributing utility, that it purchases practically all of its current from another utility, with which it is affiliated, it appears that the most logical and equitable method of making this allocation is on the basis of the ratio of actual sales of K W H to Martinsville and its consumers to the total sales of K W H by plaintiff during the year 1929, that being the last calendar year before the date of the hearing. By the use of actual sales figures, line and transformation losses are accounted for. One of the commission's engineers made a calculation upon this basis and found the ratio to be 3.027 per cent. However, a calculation, based upon the output of the substation at Martinsville for the year 1929, which was 2,532,798 K W H, and the total output of all substations of plaintiff during the same period, which was 75,811,626 K W H, shows the ratio to be 3.34 per cent. The various calculations are comparatively close; several calculations other than the above having been introduced in evidence.

A study of all the evidence upon this question convinces us that a ratio of 3.30 per cent. is fair, and is the one that should be used in arriving at the value of that part of plaintiff's power system which should be allocated to Martinsville. Applying this method, we find such value to be $101,191. The maximum value of such allocated property, fixed by the commission's engineer, as shown by the evidence presented to the master, was $86,825.

It is contended by the plaintiff that an allowance should have been made for the "Cost of Financing" in determining the value of its property at Martinsville and the value of that part of all its property allocated thereto. This has been held in some instances to be a proper charge. In the instant case, however, there is no evidence that such a cost was incurred, or, in the event of reconstruction, that it would be necessary to incur such an expense. The master properly refused to make an allowance for this item. Vincennes Water Supply Co. v. Public Service Commission (C. C. A. 7) 34 F.(2d) 5.

In fixing the value, therefore, of plaintiff's property, to be used as the rate base for Martinsville, and upon which it is entitled to a reasonable return, there should be added the following:

Value of local property......... $102,947.00
Value of power system allocated
  to Martinsville............... 101,191.00

Total .................. $204,138.00

It is apparent that this valuation is in excess of that fixed by the commission. This fact is of no importance, however, if the net revenue received by plaintiff, through the operation of the schedule of rates provided in the order in question, is sufficient to constitute a reasonable return upon the value, as found by the court.

Therefore the next and final question to be determined is whether or not the schedule of rates, as fixed by the order of the commission, will yield a reasonable return upon the value of plaintiff's property, as found by this court; that is, upon the sum of $204,138. There is no fixed rule by which to determine the rate of return to which a public utility is entitled. Each case must be considered separately, and much depends upon the circumstances and the locality. Upon this question it has been said by the United States Supreme Court that, "among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted, and the rate expected and usually realized there [in such locality] upon investments of a somewhat similar nature with regard to the risk attending them." Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 198, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

This court has, at various times, fixed different rates of return, depending upon all of the surrounding circumstances, as shown

in each particular case. For instance, in the case of Greencastle Water Works v. Public Service Commission et al. (D. C.) 31 F.(2d) 600, the rate of return was fixed at 6½ per cent., and the utility is operating under an order prepared by the commission providing for such return, and has been so operating for several years. In the case of McCardle et al. v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, the Supreme Court of the United States affirmed a judgment of this court fixing the rate of return at 7 per cent.

■ The business in which plaintiff is engaged is not surrounded by any unusual hazards, although competition in that field is rather keen. The demand for electrical current is increasing from year to year, rather than diminishing, and plaintiff and its affiliated companies comprise one of the largest groups engaged in the manufacture and distribution thereof in the country. A return of 7 per cent. upon the value, as fixed by this court, will yield a reasonable return upon such value.

If the schedule of rates provided by the order in question had been in effect during the year 1929, the gross revenue received by plaintiff in Martinsville would have been $84,-750.13 If in effect during the year ending May 31, 1930, the date of the hearing in this case, such gross revenue for the year ending upon that date would have been $81,862.72. There is no dispute as to the gross revenue that would have been received during these periods, but the dispute arises as to the proper operating charges. It is fair to consider the year ending May 31, 1930, as a basis for the testing of the schedule of rates in question in determining whether or not they provide a reasonable return. The total operating expense to which plaintiff is entitled to deduct from its gross income during this period for distribution, utilization, commercial, new business, general and miscellaneous, taxes, uncollected accounts, amounts to $25,544.43. To this amount must be added cost of power and the reasonable expense of this rate hearing. In other words, there must be fixed a price which plaintiff will be permitted to charge as an operating expense for the electric current delivered to Martinsville, which has been referred to as the "gateway" price. It is not an easy problem to determine the method to be adopted in determining this price. It is the contention of the plaintiff that the correct method to determine the proper "gateway" charge at Martinsville is to include all electricity delivered by it to all gateways. This would necessarily exclude that delivered to its affiliated companies, a great amount of which is delivered to the Attica Electric Company, and to the Northern Indiana Power Company. Using this method, the plaintiff contends that the proper charge is $.022897 per K W H, which, applied to the year ending May 31, 1930, in which there was delivered to Martinsville 2,528,511 K W H, the total charge for electrical current for that period would be $57,-895.32. In arriving at this "gateway" charge, the plaintiff considers its entire power system operating expense, which is more than $1,000,000, and deducts therefrom operating expenses and taxes on property, which it allocates to the use of the Attica Electric Company and the Northern Indiana Power Company. In carrying out this theory, it allocated to the Attica Electric Company and to the Northern Indiana Power Company approximately 31.9 per cent. of its physical property, which it deducted from the value of all of its physical property, and fixed a rate of return of 8 per cent. upon the balance, after making this deduction. It also figured a 4 per cent. depreciation. The commission fixed the proper "gateway" charge at $.0172 per K W H. It apparently arrived at this charge by a computation of the average cost per K W H during a given period of time, to which it arbitrarily added a small amount for what it considered a fair return upon the property, used and useful, in the generation of such current and its delivery to Martinsville.

This court cannot accept the method advanced by plaintiff as being the proper method to be used in determining such "gateway" charge. The plaintiff is one of several affiliated companies, included in which are the Attica Electric Company and the Northern Indiana Power Company, all under a common management and organized primarily for the purpose of disposing of the electric current generated at the Dresser Plant. The actual "gateway" cost of current delivered to Martinsville, exclusive of any allowance for depreciation and return, was $.0133 per K W H for the year ending May 31, 1930. This price is adequate, and is the price found by this court to be a proper charge for all electrical current furnished during that year to defendant city. The amount delivered was 2,528,511 K W H at $.0133, making a total of $33,629.20, which amount plaintiff is entitled to charge as an operating expense for that year. A proper charge of 4 per cent. for depreciation of the value of the physical property allocated to Martinsville has been

allowed, but is not included in the "gateway" charge.

■ The other question is the amount allowed as expenses of this rate case. The commission made an allowance of $4,000 amortized over a period of ten years, or a charge to operating expense of $400 per year. The plaintiff contends that it should be allowed a sum in excess of $60,000 for this expense; in fact, it entered a charge on its books in the sum of $6,235.98 for rate expense for the year 1929, and charged this amount as an operating expense against Martinsville. This charge is, within itself, an answer to the theory of plaintiff as to the method to be used in determining the value of its property; that is, that it must be considered as an entirety. If a rate expense as high as that asked, approximately 75 per cent. of the gross receipts for one year, is permitted to be charged to operating expense, it will serve as a penalty for the filing of a petition by a municipality, or its citizens, for a reduction in rates, because it will invariably culminate in an increase, rather than a reduction. The amount, as fixed by the commission, is reasonable.

■ A simple computation for the year ending May 31, 1930, discloses the following:

Gross Revenue.................$81,868.72
Operating Expenses
Power—2,528,511 K W H @
$.0133 .....................$33,629.20
Rate Expense................. 400.00
Other Expenses............... 25,544.43

Total ....................$59,573.63
From which should be deducted for
indirect charges to "Construction" the sum of.............. 4,920.25

Balance ..................$54,653.38

To this balance should be added 4 per cent. of the physical value of plaintiff's property at Martinsville and of the power system allocated thereto for depreciation, which amounts to $6,775.16, making a total operating charge of $61,428.54, which amount, deducted from the gross revenue, leaves a net revenue in the sum of $20,440.18. This sum represents a return far in excess of 7 per cent. of the value of plaintiff's property ($204,138) which the court has found to be a reasonable return.

Under this state of facts, the schedule of rates provided in the order of the commission in question is adequate to yield a reasonable return upon plaintiff's property, used and useful, in supplying electricity to the city of Martinsville. Such rates are not confiscatory, and do not violate any of plaintiff's rights under the Constitution of the United States.

The temporary injunction heretofore issued, and now in effect in this case, will be dissolved, and plaintiff will refund to its customers, or credit to their respective accounts, all sums of money which it has collected in excess of those which it would have collected under the schedule of rates as provided in the order in question. Exceptions of plaintiff to the special master's report are overruled, and the bill is dismissed for want of equity.

A decree will be entered accordingly.