## WABASH VALLEY ELECTRIC CO. v. YOUNG ET AL.

No. 128. Argued December 7, 1932.—Decided January 9, 1933.

Mr. *John C. Lawyer,* with whom *Messrs. George A. Cooke, Francis L. Daily,* and *Howard S. Young* were on the brief, for appellant.

490

492

*Messrs. Arthur L. Gilliom* and *George Hufsmith,* Assistant Attorney General of Indiana, with whom *Messrs. James M. Ogden,* Attorney General, and *Ralph K. Lowder* were on the brief, for appellees.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Appellant is one of seven affiliated public utility corporations organized under the laws of Indiana, more than

99 per cent. of the combined capital stock and securities of which is owned by the Central Indiana Power Company. The officers and directors of the several corporations are the same, and the operations of the entire group are under a common control, so that in substance the business of all is carried on as though they constituted a single entity. Their lines are interconnected, and the electrical energy distributed by them is drawn from common sources. Appellant owns and operates an interconnected system in a territory comprising thirteen counties of the state, and sells and distributes electric current to approximately fifty cities and towns therein, including the inhabitants of the City of Martinsville, and also to a large number of industrial plants and customers outside the limits of such cities and towns. Appellant's system consists in the main of general transmission and transformation properties, and local distributing plants. Among other local plants it owns one in the City of Martinsville, which was built by former owners to supply that city and its inhabitants. In the hands of the original owners this was a separate and complete plant, generating electrical energy as well as distributing it.

Nearly all the electric current distributed by appellant is " purchased " by it from one of the other affiliated corporations which has had in operation since 1924 an extensive and modern generating plant known as the " Dresser Plant." The combined needs of the affiliated corporations have so increased that for the year ending May 31, 1930, the total current used greatly exceeded that supplied by the Dresser Plant; and in order to meet the increased demand the affiliated system was connected with other large generating plants in Indiana and Ohio. In furtherance of the general plans of the affiliated group, appellant some years ago purchased the local electric plant at Martinsville and similar plants in many other

cities and towns within the thirteen counties above referred to.

The Martinsville plant now is operated by appellant under an indeterminate permit from the state in virtue of the provisions of the state Public Utility Act. 3 Burns Ann. Ind. Stat., 1926, § 12672, *et seq.* The current is fed into this plant from outside sources, principally from the Dresser Plant. Section 57 of the Public Utility Act (*supra*, § 12728) authorizes, among others, any municipal organization or any ten persons directly interested to make complaint to the Public Service Commission challenging any rates, tolls, etc., as unreasonable or unjustly discriminatory. Under that provision, on March 16, 1927, seventeen citizens of Martinsville, patrons of appellant, filed with the Public Service Commission of Indiana a petition seeking a reduction in electric rates, in which petition the City of Martinsville subsequently joined. At that time, and prior thereto, appellant had on file with the commission a schedule of rates applicable only in that city. After hearings, the commission made an order, effective as of February 1, 1929, reducing the rates for electric service to be charged and collected by appellant in Martinsville.

Appellant, being dissatisfied with these rates and asserting that they were confiscatory, brought suit in the federal district court for the southern district of Indiana to enjoin the commission and others from enforcing the order. The City of Martinsville intervened and filed an answer in support of the rates. The court issued a temporary injunction and referred the case to a special master to hear and report the evidence to the court, together with his findings of fact and conclusions of law. The master heard the case and made a report of the evidence and of his findings of fact and conclusions thereon, to which appellant filed a large number of exceptions. The district court, consisting of three judges (§ 266 of the Judicial Code, U. S. C., Title 28, § 380), approved the report of

the master and also made findings of fact and conclusions of law in accordance with Equity Rule 70½, and, thereupon, delivered an opinion and entered a decree dissolving the temporary injunction, directing appellant to refund to its customers all amounts collected from them in excess of those which it would have collected under the schedule of rates complained of, and dismissing the bill for want of equity. 1 F. Supp. 106.

*Rate base.* The court below held that under the provisions of the state statute and in the light of the facts, not the entire property and system of appellant, but the City of Martinsville alone should be treated as the unit for the purpose of determining the schedule of rates to be charged therein. The commission, as well as the master, had reached the same conclusion. Upon that basis, in fixing the value of the property used and useful for supplying electric current to the city, the court determined the value of the local property, to which it added that proportionate part of the value of the system property which it found to be fairly attributable to the Martinsville service.

Appellant's chief contention is that its entire operating property should be taken as a unit in fixing the rate base, and that the action of the court in failing to do so deprived it of its property without due process of law.

The Martinsville plant, prior to its acquisition by appellant, had produced within itself the whole of the electric current which its owners sold and distributed. That it then was a distinct unit for the purpose of fixing rates, if and when necessary, is, of course, clear. If the former owners had simply abandoned the use of the local generating appliances and purchased electric current from outside sources, the plant, for all purposes of rate making and regulation, would have remained a distinct and separate unit. It was this unit which appellant acquired; and if appellant had continued to operate it as it then was

being operated, that is to say, as a generating, as well as a distributing, plant for the entire electric current supplied to the city, the value of the plant with appropriate allowances for expenses, etc., would have continued to be the lawful rate base. But that method of operation was abandoned; and the question is whether, because the local plant now is interconnected with appellant's general distributing system and the electric current is drawn from outside sources, the city still may be treated as a separate unit for rate making purposes.

The answer primarily depends upon the meaning and application of the state Public Utility Act. The Supreme Court of Indiana thus far has not dealt with the question; but the Supreme Court of Wisconsin, construing an act of that state essentially the same as the Indiana act, has determined that the Wisconsin commission was " required to treat the municipality as a unit and to base its rate upon the cost to the utility of serving the individual municipality rather than the average cost of serving many distinct and scattered municipalities." *Eau Claire* v. *Wisconsin-Minnesota L. & P. Co.*, 178 Wis. 207, 220; 189 N. W. 476, 481. This result was deduced by the Wisconsin court (pp. 217 *et seq.*) not from any express provision of the statute, but from a consideration of many correlated statutory provisions and in the light of " the history of commercial, economic, and political development." That court pointed out that when the Public Utility Act was enacted, each municipality was charged with the duty of furnishing public utility service and endowed with power to perform that duty; that each municipality had, and dealt with, an individual public utility; that there was no great development of power by a single utility serving numerous municipalities scattered far and wide; and, hence, that present day developments could not have been within the contemplation of

the legislature because they did not exist. The court stressed the fact that, notwithstanding the subsequent large developments of power which had come about since the passage of the utility law, there had been no modification of that law, which, in the light of conditions then existing, must have "regarded the municipality as the entity on the one hand and the utility as the entity on the other, for the purpose of establishing just and reasonable rates and service." Upon these considerations and others, the court reached the conclusion above stated.

Since the Indiana act was patterned after the Wisconsin act with a like history and attended by similar circumstances, the court below felt warranted in following the decision of the Wisconsin court; and with that view we see no reason to disagree. Whether the method afforded by the state statute thus construed is in accordance with sound policy is a question with which we are not concerned. See *Wabash, St. L. & P. Ry. Co.* v. *Illinois,* 118 U. S. 557, 577; *Minnesota Rate Cases,* 230 U. S. 352, 416. The only question we are called upon to consider is whether, under the due process clause of the Fourteenth Amendment, the method is constitutional.

Normally, the unit for rate making purposes, we may assume, would be the entire interconnected operating property of a utility used and useful for the convenience of the public in the territory served, without regard to particular groups of consumers or local subdivisions. But conditions may be such as to require or permit the fixing of a smaller unit. Compare *United Fuel Gas Co.* v. *Railroad Commission,* 278 U. S. 300; *United Fuel Gas Co.* v. *Pub. Serv. Commn., id.,* 322; *Minnesota Rate Cases, supra,* at pp. 434–436; *Smith* v. *Illinois Bell Tel. Co.,* 282 U. S. 133, 148, *et seq.; Houston* v. *Southwestern Bell Tel. Co.,* 259 U. S. 318, 322.

The three cases last cited recognize that where the business of a carrier or utility is both interstate and intra-

state, the state rates for intrastate transportation or business must be determined by a separate consideration of the value of the property employed in the intrastate business. It is true that there such a separation is made necessary because a different government exercises the rate making power in each of the two fields of regulation; and that situation is wanting here. Nevertheless, the cases furnish a helpful illustration in support of the application of a similar rule in the case now under review. Compare *United Fuel Gas Co.* v. *Railroad Commission,* 13 F. (2d) 510, 522; *United Fuel Gas Co.* v. *Public Service Commn.,* 14 F. (2d) 209, 223; *Idaho Power Co.* v. *Thompson,* 19 F. (2d) 547, 571; and see *International Ry. Co.* v. *Prendergast,* 1 F. Supp. 623, 626.

In addition to what already has been said, it should be noted that appellant not only furnishes electric current to the fifty separate and unrelated towns and cities, in none of which the plant is used or useful for the rendition of service to any other town or city, but appellant also carries over its lines and delivers to others of the affiliated companies, as intercorporate transactions, varying portions of the entire current borne by its lines for subsequent distribution by the affiliated companies to their customers, including many towns and cities within their respective territories. This intermingling of the business and distributing activities of the several companies results in such elements of uncertainty in respect of the proper evaluation of appellant's participation therein that, standing alone, it would go far in the direction of justifying the rejection of the contention that the due process clause requires that appellant's entire distributing system should be included in the basic unit. In the light of all the facts and circumstances, we hold that an adjustment of rates for the municipality here served by appellant in accordance with the method adopted below is consonant with state law and immune from constitutional attack.

*Valuation and Expense Allowances.* Appellant further contends that, assuming this method to be free from constitutional objection, the valuation put upon the property is so low as to result in confiscation. To meet this objection it is only necessary that there shall be brought into the rate base the value of all property of appellant which is in fact used and useful for supplying the electric current to the city. Manifestly, the local plants in other towns and cities bear no such relation to the Martinsville plant. As already shown, these various plants are separate and distinct from one another, and they were properly left out of the calculation. See *Hardin-Wyandot Lighting Co.* v. *Public Utilities Commn.,* 118 Ohio St. 592, 601; 162 N. E. 262. The property values fixed by the commission and those fixed by the master and approved by the court differ to some degree, but not so materially as to affect the result. Upon the basis adopted, that is, first to value the local property and then add that proportionate part of the value of the general distributing system found to be fairly attributable to the Martinsville service, the figures finally arrived at by the master and the court were $102,947 for the local plant, and $101,191 for the proportionate value of the other property, or a total of $204,138. In arriving at the second figure a proportionate part of the total value of the general system was allocated to Martinsville " on the basis of the ratio of actual sales of Kw. H. to Martinsville and its consumers to the total sales of Kw. H. by plaintiff during the year 1929, that being the last calendar year before the date of the hearing." This ratio was arrived at and supported by a variety of calculations, the results differing slightly, and upon these various calculations the court fixed 3.3 per cent. as the fair ratio of the value to be allocated to Martinsville.

We deem it unnecessary to repeat the details which led to the court's conclusion. The findings of the court and

of the master are full and convincing and give evidence of careful and thorough consideration. The deductions from the evidence and the calculations are of necessity more or less approximate (*Utah Power & L. Co.* v. *Pfost,* 286 U. S. 165, 190), but we find nothing in the record which casts a substantial doubt upon their essential fairness.

Complaint is made that in determining the value of the Martinsville property no allowance was made for cost of financing. As the court below, however, pointed out, there was no evidence that such cost was incurred, or that it necessarily would be incurred in the event of reconstruction. This is also in accordance with the findings of the master. We see no reason to interfere. See *Vincennes Water Supply Co.* v. *Public Service Commn.,* 34 F. (2d) 5, 9.

The commission, the master, and the court below all rejected as exorbitant the claim of appellant for an allowance of $60,000 rate case expenses, and allowed the sum of $4,000, to be amortized as an operating charge over a period of ten years. This action, it is contended, was arbitrary and without basis in the evidence. While there is evidence in the record that appellant expended the amount claimed, there is further evidence justifying the conclusion that a large part of the expenditure was made for the additional purpose of securing data relating to a merger proceeding with which the Martinsville rates are in no way connected. There is also evidence that the appraisal covered the local property in the other municipalities, which, as we have seen, are without relation to the Martinsville distribution. From a consideration of all the evidence it seems clear that the refusal to allow, as against the Martinsville plant, the entire $60,000 was well founded. That being so, it became necessary to fix that part of the sum reasonably chargeable as an expense of the Martinsville rate case. The commission and the master, who heard the evidence and were familiar with all the details,

reached the same conclusion as to the amount. While it may be true that even upon the view taken a larger sum than $4,000 might well have been allowed, we find nothing sufficiently definite in the record to require us so to determine, or to call for a disturbance of the amount fixed.

*Rate of return.* The court below found that a rate of return of 7 per cent. was adequate. The evidence is conflicting. Witnesses for appellees estimated that 7 per cent. was sufficient. The testimony for appellant was to the effect that to take care of bonds, debt discounts, borrowed money and stock dividends a return of 7 per cent. was sufficient; but that in order to accumulate a surplus and make it easier to finance the company, the rate of return should be not less than 8 per cent. Appellant's balance sheets show that on January 1, 1929, it had an accumulated surplus of $1,074,739.71, and, at the end of that year, a surplus of $1,257,884.64, as compared with a total stock and funded debt liability of about $4,500,000. The record, as already stated, also shows that appellant is a subsidiary of the Central Indiana Power Company by which it is owned and financed, its securities having been taken directly by that company without any intervening agency. The power company also owns and finances the other affiliated corporations in the same way. It is reasonable to conclude that appellant is in a more favorable financial condition than if it were a disconnected enterprise.

It is true, as appellant points out, that in *United Railways* v. *West,* 280 U. S. 234, 251–252, this court held that a rate of return for a street railway of less than 7.44 per cent. was confiscatory, saying that sound business management required that after paying all expenses of operation, etc., "there should still remain something to be passed to the surplus account; " and that a rate of return which did not admit of that being done was not sufficient to enable a utility to maintain its credit and raise money

for the proper discharge of its public duties. Many cases were cited tending to show that a return of 7½ per cent. or even 8 per cent. might be necessary, but it was said (pp. 249–250) that no rule could be laid down which would apply uniformly to all sorts of utilities. "What may be a fair return for one may be inadequate for another, depending upon circumstances, locality and risk." A street railway company, compelled to meet the growing competition of private automobiles, public omnibuses, and other motor carriers, well might sustain such losses of revenue because of the decreased number of passengers carried, as to require a larger rate of return than would be required by an electric utility company like appellant, which not only enjoys a practical monopoly in the field where its services are rendered, but whose financial structure, it fairly may be assumed, is greatly strengthened by its affiliations and by the interested support of the parent company to which it belongs. On the whole we are unable to conclude that a 7 per cent. rate of return, under the facts here disclosed, is so low as to be confiscatory. See *Smith* v. *Illinois Bell Tel. Co., supra*, at pp. 160–161.

Moreover it appears, as the master and the lower court found, that if the rates complained of had been in force during the period beginning January 1, 1929, and ending May 31, 1930, the return would have been much in excess of 7 per cent. on the value fixed.

*Decree affirmed.*