## OHIO ASSOCIATED TELEPHONE CO. v. GEIGER et al.

### No. 837.

District Court, S. D. Ohio, E. D.

June 9, 1933.

J. G. Fogg, of Cleveland, Ohio, and H. J. Linton, of Columbus, Ohio, for plaintiff.

The Attorney General for defendants.

Before HICKENLOOPER, Circuit Judge, and NEVIN and HOUGH, District Judges.

PER CURIAM.

Ohio Associated Telephone Company, hereinafter designated the company, plaintiff, seeks injunction against the defendant Public Utilities Commission of Ohio, hereinafter referred to as the commission, for claimed confiscation as the result of the commission's final orders of September 26 and October 8, 1930.

Prior to August, 1925, the company, through its predecessor, filed proposed schedules of increased rates for telephone service, and gave bond for the return of excessive collections, and thus put into effect the higher rates, beginning on the 1st day of August, 1925, which rates were collected by the company from that day until the filing of this suit on the 29th day of October, 1930, and in fact until the order of this court, effective on the 1st day of May, 1931.

In due course, subsequent to the going into effect of the higher rate schedule, the commission made its investigations and appraisals, and held its hearing, and on the 26th day of September, 1930, issued its final order, establishing a schedule of rates which had been determined by it to produce a rate of return of 7 per centum upon the company's property, used and useful; and on the 8th day of October, 1930, issued its order directing the company to put the new rates in effect, beginning November 1, 1930, and directed further (by the terms of the September 28th order), a refund of the charges collected since August 1, 1925, in excess of the schedules determined by the commission, and effective January 1, 1931.

The schedule of rates as found by the commission were determined upon valuation so low as to be unfair, it is contended, and that, as well as an insufficient rate of return, has produced the confiscation of the company's property.

Upon the hearing of the application for a preliminary injunction, this court enjoined the enforcement of the commission's order for the return of the excess rates collected by the company, until the further order of the court upon final determination, but declined further restraint (a temporary restraining order had been issued and remained in force under a stipulation of the parties), after May 1, 1931, in respect to the commission's order putting the new rates into effect, and appointed a special master to hear the evidence and report his findings of fact and conclusions of law.

The case has been submitted to the court upon the report of the special master, the company's exceptions to the report, the briefs and arguments. The forty-one exceptions filed do not assail the master's method and formula of the establishment of a rate of return, except in one particular, covered by the first four exceptions, but do assail practically all his findings and conclusions.

The inquiry in this case and the testimony adduced, covers the period from August 1, 1925, to April 30, 1931 inclusive. The master made his various findings of fact to establish the rate base and net income for the year 1930, and based his conclusion in respect to the question of confiscation throughout the entire period upon the findings thus made for the year 1930. The complainant takes emphatic exception to this method as contrary to the principles laid down in the decisions of the Supreme Court. Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255; Bluefield Water Works Co. v. Public Service Commission, 262 U. S. 680, 43 S. Ct. 675, 67 L. Ed. 1176. In the Illinois Case, at page 162 of 282 U. S., 51 S. Ct. 65, 73, the court said: "A rate order which is confiscatory when made may cease to be confiscatory, or one which is valid when made may become confiscatory at a later period." And in the Bluefield Case at page 693 of 262 U. S., 43 S. Ct. 675, 679, it is said that: "A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." And on page 694 of 262 U. S., 43 S. Ct. 675, 679: "The fact that the company may not insist as a matter of constitutional right that past losses be made up by rates to be applied in the present and future tends to weaken credit, and the fact that the utility is protected against being compelled to serve for confiscatory rates tends to support it." Compare Brush Electric Co. v. Galveston, 262 U. S. 443, 43 S. Ct. 606, 67 L. Ed. 1076; Lincoln Gas & Electric Co.

v. Lincoln, 250 U. S. 256, 39 S. Ct. 454, 63 L. Ed. 968; United Railways Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390. This principle of law will be inapplicable in this case, however, if it is ascertainable from the master's findings, based upon his own valuations, that the rate of return for the other years are fairly comparable to the year 1930, and all disclose a nonconfiscatory result. The appraisal figures for the seven periods (years 1926, 1927, 1928, 1929, and 1930, and fractions of years 1925 and 1931) submitted by the company in Exhibits 2 and 10–J, and by the commission in Exhibit 0 (including exchange and toll), disclose in each group a uniformity of amounts over the period, with little material differences to affect rate of return. In addition to this, the accrued depreciation as per the master's finding, and the average accrued depreciation testified to by the witnesses and applied by the court (later to be discussed), discloses a nearly uniform present condition, referable to the various periods. The rate of return for the several periods then will differ as and in proportion to the differences in net income. The average annual income for the seven periods has been worked out in table 1 of defendant's brief by a system of percentages found by comparing the master's finding of net income for 1930 with that calculated and testified to by defendant's witnesses, and produces in round numbers $72,000 for the 1925 period, gradually increasing in amounts to the maximum of $99,000 in 1930, and $97,000 in 1931. The corresponding rates of return thus arrived at are 6.39 per cent., 6.68 per cent., 6.96 per cent., 7.92 per cent., 8.62 per cent., 8.73 per cent., and 8.55 per cent. respectively.

■■ To insure against unconstitutionality, a rate of return to a utility must be adequate, but adequacy is to be judged under the circumstances and the situation of the particular utility in question. The court of last resort has had occasion to speak upon this subject many times during the past decade. As was said in the Illinois Telephone Case (Smith v. Illinois Bell Telephone Co.) 282 U. S. 133, 51 S. Ct. 65, 73, 75 L. Ed. 255: "A rule as to rate of return cannot be laid down which would apply uniformly to all sorts of utilities; 'what may be a fair return for one may be inadequate for another, depending upon circumstances, locality, and risk.'" A 7 per cent. rate was found adequate in this case. And again, in the case of Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 198, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, the court said: "There is no particular rate of compensation which must, in all cases and in all parts of the country, be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality." McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, found a 7 per cent. rate necessary to be adequate, and Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244, and Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 U. S. 655, 32 S. Ct. 389, 56 L. Ed. 594, each approved a 6 per cent. rate of return. Still other decisions of the federal courts have approved rates of return well under 6 per cent. A statutory District Court recently held that under existing, generally depressed industrial and financial conditions there is no warrant in finding that a probable return of 5.17 per cent. is confiscatory. Kankakee Water Co. v. Gilbert, U. S. District Court, Eastern Division of Illinois (January 6, 1933.)[1]

It is urged, though, that the Supreme Court in United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390, decided that a rate of return less than 7.44 per cent. was confiscatory, and indicated that under some conditions an 8 per cent. rate would be no more than necessary. That court at a later date upheld a 7 per cent. rate of return for an electric power company. Wabash Valley Elec. Co. v. Young et al., 287 U. S. 488, 53 S. Ct. 234, 77 L. Ed. 447. In the course of the opinion, at page 502 of 287 U. S., 53 S. Ct. 234, 238, in this case, Justice Sutherland, in discussing the West Case, said: "A street railway company, compelled to meet the growing competition of private automobiles, public omnibuses, and other motor carriers, well might sustain such losses of revenue because of the decreased numbers of passengers carried, as to require a larger rate of return than would be required by an electric utility company like appellant, which not only enjoys a practical monopoly in the field where its services are rendered, but whose financial structure, it fairly may be assumed, is greatly strengthened by its affiliations and by the interested support of the parent company to which it belongs."

The company here under consideration enjoys a monopoly in the community in which it operated. Its fixed property has remained at uniform value over the period of in-

[1] No opinion filed.

vestigation, its condition uniformly at a high per cent. of reproduction cost new. Its management, through parental ownership, it may be assumed, is of a high grade of efficiency. Its financial position, because of its subsidiary character (Wabash Valley Elec. Co. v. Young et al., 287 U. S. 488, 53 S. Ct. 234, 77 L. Ed. 447) and the disadvantageous economic and business conditions in which it has been operating during the latter periods under consideration, and the knowledge that those conditions will continue to prevail for the immediate future, coupled with the disclosures that the net income since 1928 has increased over previous years, producing a correspondingly higher rate of return, all point to the conclusion that the master's finding of a 7.7 per cent. rate of return is adequate, and that the allocation calculations over the seven periods upon the master's valuations produce rates of return for each period, well within constitutional requirements.

A detailed investigation of the master's separate findings, together with the court's approval or modification of the same, will be necessary in order to properly cover the scope of the company's numerous exceptions. Figures determining any new valuations will have to be carried into calculations for determining rate base, net income, and rate of return. In order to accomplish this, it will also be essential that the court's findings be first made for the year 1930, and then distributed over and allocated to the seven periods.

The witnesses' appraisals of the following accounts result in no material differences in amount, to wit: Buildings, private branch exchange, booths and special fittings, office furniture and fixtures, general store equipment, general stable and garage equipment, general tools and implements, station apparatus, central office telephone equipment, and other equipment of central office. With one exception the master's findings corresponded to these undisputed amounts, and are approved. His finding for central office telephone equipment was some $6,000 less than that given by witnesses both for the company and the commission. The court follows the evidence, and the amount for this item is fixed at $267,563.88. It appears that his finding of the value of the right of way was fixed at the highest value testified to by defendant's witness, and that this was greater than shown by the company's books. It is approved. The master followed the evidence of disinterested witnesses on land value, whose evidence assessed the value as of 1925. This finding is approved.

For station installations, the master adopted the value fixed by the witnesses for the defendant, and that value was based on rates of pay in force in the community wherein the telephone company operated. The witness Morse, for the plaintiff, agrees substantially with this appraisal, indicating that his testimony was based upon similar data. The appraisal by the company's witness Hirsch is entirely out of line, indicating a false basis and unfair result. The court adopts the value fixed by Morse in the sum of $18,232.20. The master's finding for the interior block wires account is adopted. Values on outside plant accounts, including exchange pole lines, aerial cable, aerial wire, underground conduit, underground cable and toll pole line, and aerial wire, by the master, rested generally upon the testimony offered by the commission's witnesses. In some instances, however, his finding was higher than that shown by some of the data offered by the commission. The testimony of the company's witnesses placed these valuations higher, in sharp contrast. This is especially true of the testimony of the witness Hirsch. The company urges strongly that the qualification of both Morse and Hirsch, as experts, is fortified by recitals of long experience in the telephone business and in the construction business pertaining to that industry. Thus far its contention is no doubt correct, but it is further claimed that the commission's witnesses, and particularly witness Stump, who was ultimately responsible for the labor cost which went into this particular valuation, were not experienced telephone engineers or experienced in the construction of telephone plants. Because of this, it is claimed that the commission testimony is incompetent for want of qualification of its witnesses, and that the exclusion of such evidence will leave in the record in this regard only the evidence of the plaintiff's witnesses, which in turn will call for the adoption of such testimony translated into the values fixed by said witnesses. The point of difference in arriving at valuation conclusions in these accounts is conceded to be the element of unit labor performance. The facts disclose that the witness Stump prepared his data of unit costs, including material, rate of pay (about which there is no disagreement), and data of labor performance, from details furnished by other engineers of the commission, and data that had been prepared, systematized, redrafted, and scientifically treated through years of experience of the engineers and accountants of the commission, dealing with appraisals and valuations of industries of this

class and of public utilities of all classes. This data was placed at the disposal of the plaintiff's representatives. Certainly the experience of years of the commission's specialists, in connection with a highly specialized element of utility valuation, and which is one of the particular concerns of the commission and its department, wherein the methods of valuation are improved and systematized, ought to have probative value and effect in a court of equity responsible for valuation solutions in connection with rate litigation. Fair opportunity for the company, through its experts, to examine the underlying data from which the facts and mathematical calculations are drawn, should be sufficient in respect to an equitable consideration of the rights of parties to render such evidence competent, of course subject to its weight and credibility. Nor are we able to say that a witness specializing in this line of work as an engineer witness of a utility commission is incompetent to testify upon such subjects, for the reason that he never built a telephone plant. The company's witnesses gave opinion evidence in relation to the value of labor performance, and one of them (Hirsch) declined to give the underlying data by which he arrived at his conclusion. This would not affect his competency as a witness, nor the competency of his testimony, but might well, depending upon the impression it would leave in the judicial mind, lessen its weight and credibility. The court adopts the master's findings in respect to these accounts.

In attempting to determine the reproduction value for the plant supervision, tool, and supply account, the record is found unsatisfactory. The witnesses are far apart in their appraisals. For the company, Morse fixes his value at over $80,000, and Hirsch at over $142,000. The commission's evidence, which the master adopted, gives a final figure of $62,779.60, said to be taken from the books of the company, and determined upon a 6 per cent. basis. Hirsch's figure, it appears includes an allowance of $69,900 for stable and garage expenses not included in the appraisals of the other witnesses, but by them prorated through the various unit costs, which, of course, means that the appraisal of these other items by Hirsch was in the aggregate that amount less than his true appraisal, had he followed the same method as that of the other witnesses. Deducting that amount, his appraisal of this account would be $72,-316. The commission's witnesses claimed to find a percentage result from the company's books of 7.82, which they reduced to 6 per cent., for the reason that in the actual and customary operation of the company the cost would be greater because of piece-meal construction. Allen, another company witness, claims that the commission's percentage calculation, or rather the basis from which the percentage was gained, was erroneous, and that taking the proper figures from the company's books as a basis would result in a percentage much higher than 7.82 per cent. There is merit in his evidence. And even with the percentage he finds, ratably reduced, would bring about a considerably higher valuation than found by the master. The uncertainty existing leads the court to adopt Hirsch's net figure of $72,316.

Wide differences exist in the appraisal of the account for omissions and contingencies. Witnesses seem to have used different formulæ and arrived at widespread results. The master finally had to use his own method, and allowed 1½ per cent. of the direct cost, excluding right of way and land, which resulted in a finding of $16,295.76, which is approved.

From an examination of the testimony in respect to general overheads, excluding interest, and the methods and reasoning used by the master in arriving at his conclusions, it may be said that the master's conclusions seem to be fair and just in his allowances for organization, engineering, law expenses, taxes during construction, and general and miscellaneous expenditures, and are therefore approved.

Again there is a wide variance between the master's findings and the testimony of the witnesses for complainant and the commission in respect to interest during construction. It seems to be conceded, and rightfully so, that the company is entitled to an allowance of interest upon the theoretical construction of the telephone plant. It is also conceded that the time of construction is two years, and that a fair rate of interest is 6 per cent. Hirsch, for the company, arrives at an interest cost of over $92,000, based upon his values covering fixed property and general overheads, at a rate of interest in excess of 6 per cent. and for a period of time slightly over two years. The commission appears to have figured interest cost based upon its figures, upon a mean average of 3 per cent. for a period of time less than two years. The master arrives at his conclusion by changing the rate of interest to 4 per cent., and basing that rate upon his findings of the aggregate physical property, excluding in his base figure the total of general overheads. In excluding general overheads, the master was

in error, as well as in his arbitrary method of arriving at a mean average of 4 per cent. Upon the premise that the company is entitled to an allowance for interest upon the construction of the hypothetical plant, and that that construction will require two years, and that money is worth 6 per cent., its entitled allowance is upon such basis. To arrive at it, it may be assumed that the plant will be constructed uniformly throughout the period, and that the contract for its construction provides for the payment of estimates at sixty-day periods. There would then be no interest allowance for the first sixty days. At the expiration of the sixty-day period, one-twelfth of the entire cost of the plant would be due and money necessary for its payment. That particular amount would then be subject to an interest charge for the remainder of the period, or eleven-twelfths of the time. At the expiration of the next sixty-day period, another twelfth of the aggregate cost would be due, and the interest allowance on this amount would be ten-twelfths of the whole period—and so on, until the expiration of the two-year period and the completion of the plant—at which time it is to be assumed the plant is completed and ready for operation, and that its corporate form has been provided, and its capitalization completed. Based upon this method of calculation, and upon the aggregate cost of reproduction value as found by the court, the interest allowance is determined to be $70,650.56.

The testimony of the witnesses upon accrued depreciation differs in percentages throughout the various items, but generally is not greatly at odds. The master, however, in fixing the percentage of depreciation for the several items, using, as he says, his own method, arrives at a conclusion comparable to those found by the witnesses in most instances. His result is a composite percentage of depreciation, or a "present condition" of the plant, found to be 89.625 per cent. In order to arrive at the accrued depreciation allocated to the depreciable items, the court has taken the general average of the percentage depreciations of the witnesses for the commission, and the two witnesses for the complainant, and depreciates its reproduction findings on all depreciable items according to this method, and in so doing finds the present condition, or per cent. condition, to be very close to 88.2 per cent.

Under the heading Working Capital, Material and Supplies, the master's finding was supposed to be based upon figures furnished by the defendants, and those in turn taken from the books of the company. If this were true, it would represent a fair method of arriving at this allowance. It is emphatically urged, however, by the company, that the figure found by the master did not represent any reflection from the books of the company, and the court is unable to find that it did. The company's evidence was based upon calculations of reproduction values determined by its witnesses, but again based as it seems upon exaggerated values, and therefore cannot be followed. The record does not present a satisfactory condition in regard to this item and going concern value. This leads the court to rest its determination upon percentages, which of course represents an arbitrary method, but covers two items which are fairly and legally to be included in the base value. No reason is apparent why these percentages should not be figured upon the present value as found by the court, of the total of fixed capital. It is therefore determined that the working capital, material, and supplies shall be fixed at 3 per cent. of the total present value of the fixed property, or $31,934.80, and that the going concern value be fixed at 5 per cent. of the same amount, which, translated into dollars, will be $53,308.

The total reproduction cost of fixed capital is found to be $1,355,090.79, to which is applied the accrued depreciation, resulting in a present value of $1,195,370.01. To this is added the items of working capital, material and supplies, and going concern value, making a total of $1,280,662.81.

Company witnesses have shown that exchange property with which we are concerned in this case bears a relationship to the whole of 93.94 per cent. There is no real dispute as to the fairness of this percentage, which was used by the master, and is adopted by the court. That percentage, applied to the whole present value, gives $1,203,054.64 as the rate base value determined.

The gross annual income shown by the books of the company over the whole period of five and three-fourth years, is not in dispute. Under the master's method of using an annual average, as of October 30, 1930, and for the year 1930, is found an annual gross income of $252,311.32. By reason of the reduction of rates by the Utility Commission, it is necessary to determine the shrinkage in gross income in order to arrive at the true basis for determining the question of confiscation. The court finds that the total amount of shrinkage over the entire period is $163,-460.86, giving an annual average shrinkage

of $23,427.97, making an annual average gross income under the lower rates of $223,883.35.

The company contends for a number of deductions from gross income: First, on account of the cost of construction materials charged to maintenance, on the theory that this charge was in the nature of a repair, in the change in the location of poles and arms. There is no satisfactory evidence to substantiate this claim. It is carried on the books under the material account, and naturally would be included in the material necessary to construct the theoretical new plant. In the same category are the claimed deductions for losses on station installation due to station changes. It is urged further that $18,000 should be added to the allowance made by the commission's witnesses, for management expenses. The $4,200 a year allowed by the master is based upon the actual outlay as shown by the company's books, over the period of time that the books were available; that is, until the year 1927. Thereafter the accounting for this expense did not appear on the books of the company, and probably was carried on the books of the parent company, which were not available to the master. This additional amount is disallowed. For rate case expenses, the complainant's witnesses fix the fair value at $6,000 per year, and the defendant's witnesses at $1,900 per year. The records of actual payments for this purpose were not made available, and the amount of proper allowance rests upon opinion testimony. The company is entitled to a fair allowance of course, but under the state of the record it is left to the exercise of fair judgment. It is considered that $2,500 a year over a period of years would be ample, and in accordance, therefore, $600 additional annual deduction is made from gross income. A deduction of $9,409.61, or an annual deduction of $1,636.45, was made by the master under capitalizable general expense. The court has approved this allowance, although its propriety is somewhat doubtful in view of the reproduction value method of determination.

The master determined an annual allowance that might be set aside as a reserve for actual depreciation, current replacements, general obsolescence, and limited replacements, in the sum of $34,078.93. This amount was arrived at by the allowance of 3 per cent.—calculated upon the total value of the property used and useful. His conclusion is arrived at from the testimony of the commission's witness and exhibit study. The witness, Wood, for the commission, founded his study upon the experience of the company during the period under consideration and the years preceeding, as disclosed by its books. The company's testimony covers as a basis of valuations found by the engineer witnesses and their opinions and conclusions drawn from their calculations and formulæ, having no appreciable connection with the actual experience of this company. Their evidence calls for a depreciation reserve of 5 per cent. of the aggregate of fixed capital property. The company's brief attempts to discredit the testimony of Wood, whose profession is that of an accountant, but whose professional efforts and experience are, and have been for some years, directed to appraisals and valuations of telephone and other public utility property.

The court is unable to say that such evidence or the witness giving it is incompetent. Wood's testimony rested upon the experience of the company itself, reflected from its books and records, and is certainly pertinent and persuasive. We find here a company in an 88 plus per cent. condition in 1930, with no reason to suppose that present condition is not average during the period of consideration. It is shown that for the ten years prior to 1927 over $305,000 disappeared from "the depreciative or obsolescence reserve" by absorption in capital, dividends, or profits, or otherwise. During the next four years, with nothing in the depreciation reserve account to start with, there was an accumulation of $150,777, or at the rate of $37,694 a year. It was pointed out in the decision of this court, upon the application for a preliminary injunction, that 3.61 per cent. of the total depreciable property of the company seemed to be not only an adequate, but a generous, percentage allowance for the depreciation reserve account. It now appears that it was very generous. The method employed by the master is adopted, and the annual allowance of 3 per cent. upon the value of all the company property used and useful, as the court has already found that amount to be, is allowed. The result is $36,091.62, which compares very favorably with that actually shown by the books. It may also be said that it compares not unfavorably with the court's preliminary decision, for it results in 3.36 per cent. of the depreciable property, which is probably the true basis upon which it should be calculated. There is no dispute, except as heretofore covered, upon the account for operating expenses and taxes. The proper amount during the period covered is $577,638.76, making an average annual operating expense of $100,452.85. To this

amount there is added $1,636.45 capitalizable general expense and $600 additional annual rate expense, and $36,091.62 annual depreciation and reserve—making a total annual expense item of $138,780.92, or an annual net income of $85,102.43. From the net income as indicated and the court's finding of the aggregate company property used and useful, to wit, $1,203,054, a rate return of 7.077 plus per cent. results.

The same process of spread of the values and findings over the various periods, as has heretofore been dealt with in the master's findings, is undertaken. Gross earnings for the separate years are taken from the books, to which is subjected the shrinkage due to rate reductions. There is then deducted the operating expenses and taxes and other deductions found by the court. In this manner the net income is found for each period. These figures are taken from the defendant's Exhibit M, and are adjusted to conform to the court's findings. The commission's valuation (Exhibit P) is compared with the court's valuation for rate base, and the latter is found to be 111.9136 per cent. of the former. This percentage is used in producing the allocated rate base amounts for the several periods.

The following rates of return are thus found: 5.60 per cent. (1925), 5.90 per cent. (1926), 6.17 per cent. (1927), 6.98 per cent. (1928), 7.61 per cent. (1929), 7.99 per cent. (1930), and 8.12 per cent. (1931).

It is interesting to note that this gives an average per cent. over the period of 6.93 per cent., which is slightly lower than that found by the court, based upon 1930 calculations, and about eight-tenths of 1 per cent. lower than that determined by the master. This rate as applied to the case under consideration is considered to be well within constitutional requirements.

No fixed rule as to rate of return can be laid down which would apply uniformly to all sorts of utilities (United Railways v. West, 280 U. S. 234, 249, 250, 50 S. Ct. 123, 74 L. Ed. 390) and very likely to utilities of the same class, but differently situated, as the equities would depend upon circumstances, locality, and risk, and other considerations. While neither set formulæ nor mathematical accuracy are possible of attainment, in the consideration of such questions account must be taken of the rule that a rate order which is confiscatory when made may cease to be confiscatory, and vice versa. Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 162, 51 S. Ct. 65, 75 L. Ed. 255; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 172, 173, 35 S. Ct. 811, 59 L. Ed. 1244; Bluefield Co. v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176. With more than five years under inquiry, divided into seven periods, showing a rate of return on an ascending scale, and dealing with this case and its equities alone, it may be fairly concluded that the rates of return shown for 1925, 1926, and 1927 do not measure up to the constitutional requirements, and that those beginning with the year 1928 are immune from constitutional defect.

It is so ordered. The costs of the case, including an allowance of $5,000 to the special master, and legal fees to the reporter, are assessed equally against the company and the commission.

It appears that the defendant commission in this case, though the proper and necessary party by favor of the provisions of law, is not the real party in interest. The customers of the company have the beneficial interest.

It is therefore ordered that the company pay the costs of this proceeding within thirty days, and that it credit itself with one-half of the costs against the fund belonging to its patrons which will be for distribution; that the company prepare and file with the clerk of this court, on or before December 1, 1933, an account showing the amount due from it to its customers, and the pro rata amount of distribution to each customer; and on or before the 1st day of May, 1934, file with the clerk documentary evidence of its having settled and paid to its customers the amounts due each, so far as it was possible to do so; after which final decree may be submitted.

In the meantime, an interlocutory decree may be submitted to the court in accordance with this opinion.