**LEEMAN et al. v. PUBLIC UTILITIES COMMISSION OF DISTRICT OF COLUMBIA et al.**

**CAPITAL TRANSIT CO. v. PUBLIC UTILITIES COMMISSION OF DISTRICT OF COLUMBA et al.**

**UNITED STATES v. PUBLIC UTILITIES COMMISSION OF DISTRICT OF COLUMBIA et al.**

Civ. Nos. 2385–51, 2400–51, 2495–51.

United States District Court
District of Columbia.

May 1, 1952.

554

Frank Hand, Jr., and Herbert P. Lee-man, both of Washington, D. C., for petitioner Herbert P. Lecman.

F. Gloyd Awalt and Daryal A. Myse, both of Washington, D. C., for petitioner Capital Transit Company.

Charles M. Irelan, U. S. Atty., for the District of Columbia, and William P. Arnold, both of Washington, D. C., for petitioner the United States.

T. Justin Moore, George D. Gibson, John W. Riely and T. Justin Moore, Jr., all of Richmond, Va., Cornelius Means and James Francis Reilly, of Washington, D. C., for respondent Potomac Electric Power Co.

Vernon E. West, Corp. Counsel for the District of Columbia, and Lloyd B. Harrison, Asst. Corp. Counsel, both of Washington, D. C., for respondent Public Utilities Commission of the District of Columbia.

HOLTZOFF, District Judge.

These are three appeals from orders of the Public Utilities Commission of the District of Columbia increasing rates for electric power furnished by the Potomac Electric Power Company. Each of the appellants is a consumer and claims that the increases granted by the Commission are not warranted. The appeals were consolidated for hearing.

These appeals are taken pursuant to a statute, D.C.Code, 1940 Ed., Title 43, Section 705, which confers on the United States District Court for the District of Columbia jurisdiction to hear and determine any appeal from an order or decision of the Commission. Any public utility or any other person or corporation affected by any final order or decision of the Commission, with an exception that is not material to the issues in these proceedings, may take an appeal therefrom within sixty days after final action by the Commission upon a petition for reconsideration.

Potomac Electric Power Company, the public utility involved in these proceedings, is engaged in the business of supplying electric power within the District of Columbia, and certain parts of Maryland and Virginia adjacent to the nation's capital. Most of its operations in Maryland and Virginia are confined to urban areas immediately adjoining Washington, D. C. Some customers, however, are located in rural sections beyond these urban centers. The amount of business conducted in the rural districts forms, however, a very small proportion of the company's activities. Insofar as it does business in Washington, D. C., the company is subject to regulation by the Public Utilities Commission of the District of Columbia. Similar regulatory bodies of Maryland and Virginia have comparable authority over the business carried on by the company in those States.

On July 28, 1950, the company submitted to the Commission an application for an increase of rates. The Commission conducted a series of hearings on this petition, at which detailed testimony and voluminous documentary evidence was introduced. On February 12, 1951, the Commission rendered a decision (Order No. 3762) granting certain increases. The opinion and the findings of the Commission indicate that the matter was studied in great detail and scrutinized with painstaking and meticulous care. The lengthy opinion of the Commission contains a close analysis of the pertinent testimony, detailed findings of fact, and an enlightening discussion of the matters in controversy.

The basic findings made by the Commission are as follows. The rate base upon which the company is entitled to earn a fair and reasonable return is $146,926,000. A fair and just rate of return is 5½%. In order to provide the required earnings, an increase in income of approximately $2,600,000 a year is necessary. The Commission also made a finding indicating how the sum of $2,600,000 should be distributed among the various types of service, i. e., residential, low voltage commercial, high voltage commercial, street lighting, street railway, and other types of service. The gross amount to be allocated to each is stated. The Commission concluded by directing the company to file rate schedules designed to produce these increases *for the system as a whole,* and further providing that the rates should be in substantial accord with the views expressed in the findings and opinion.

In due course the company submitted detailed rate schedules in accordance with the foregoing order. After another series of hearings at which the proposed rates were considered, the Commission on March 20, 1951, issued an Order, No. 3774, approving the new schedules, on the basis of a finding that "the distribution of the authorized increase in gross operating revenue by classes of service, are in substantial compliance with the views of the Commission expressed in Order No. 3762." The Commission further found that these rates were just, reasonable, and nondiscriminatory. The final outcome was an increase of 5.5% for residential consumers; 6.3% for low voltage commercial customers; 8.6% for high voltage commercial consumers; 27% for street lighting; and 23.1% for street railway service.

It is understood that the Maryland and Virginia Commissions cooperated by promulgating similar rates within their respective jurisdictions. Their counsel were permitted to appear in these proceedings as *amici curiae.*

The three appeals here for consideration were filed in this Court by various consumers, who claim that the increases in rates were not warranted. Appellant Leeman is a residential consumer and contends that residential rates should not have been raised. Appellant Capital Transit Company is a public utility operating street car and bus lines in the District of Columbia and adjoining territory, and is a large consumer of direct current. It asserts that the rates fixed for the power furnished to it are too high. The third appellant, the United States of America, is also a large consumer and objects to the increase of rates so far as it is concerned.

At the outset it is important to chart the scope of judicial review. These proceedings differ in principle from actions brought by public utilities challenging a rate fixing order on the ground that the rates are confiscatory. Proceedings of the latter type present questions of deprivation of constitutional rights and, therefore, entitle the aggrieved party to broad judicial review. These appeals, on the other hand, are brought by consumers who claim that the rates established by the Commission are too high. No constitutional question is involved. The appeals are purely statutory and the range of judicial review is limited and restricted by Act of Congress.

The applicable statute provides, first, that the review by the court shall be limited to questions of law; and second, that "the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious", D.C. Code, Title 43, Section 706. It perhaps may be said that a finding is unreasonable, arbitrary and capricious if it is not sustained by substantial evidence.

The basic principles of judicial review of rate-fixing orders of administrative bodies were formulated in Federal Power Comm., v. Hope Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333, as follows:

"It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does

not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

In Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260, Mr. Justice Cardozo, in his usual felicitous manner, expressed a similar doctrine:

"The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the commission by training and experience is qualified to form. Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. [1077], April 2, 1934. It is not the province of a court to absorb this function to itself. I.C.C. v. Louisville & Nashville R. Co., 227 U.S. 88, 100, 33 S.Ct. 185, 57 L.Ed. 431; Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941; Virginian Ry. Co. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463. The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."

The questions that this Court may consider, therefore, are: first, whether the Commission has committed any error of law vitiating its order; second, whether its conclusions are adequately supported by findings of fact; and third, whether the findings of fact are sustained by substantial evidence.

Before entering on a discussion of the merits, a preliminary procedural matter should be mentioned. The applicable statute, in effect, provides that in order to be qualified to appeal from an order of the Commission, the party claiming to be aggrieved must make an application to the Commission for reconsideration within thirty days after the publication of its final order or decision. It is objected by the respondents that the United States of America is not entitled to be heard on appeal because of alleged failure to comply with this requirement. Admittedly the United States filed no petition for reconsideration within the thirty-day period after the promulgation of the first order of the Commission, that is Order No. 3762, dated February 12, 1951. Such a petition was filed by it, however, within thirty days after the making of the final order of the Commission, dated March 20, 1951. On preliminary motions to dismiss the appeal of the Government, this Court held that the United States satisfied the statutory provision, since the first order of the Commission was in effect an interlocutory order formulating merely the principles on which the new rate schedules should be prescribed, while the second order prescribing the actual rates should be regarded as the final order. The situation is similar to that of an interlocutory judgment of a court followed by a final judgment. An appeal from the final judgment brings up for review questions determined by the interlocutory decree. In the same manner in this case the final order prescribing the actual rates brings up for review the prior order, which formulated the principles on which the new rates should be based. In view of these considerations the motions to dismiss the appeal of the United States were denied.

The principal objection advanced against the orders under scrutiny is that the Commission in fixing the rate base and in determining the cost of furnishing service, considered all of the property and all of the operations of the company as an entirety. It is contended that this course was erroneous and that the Commission should have segregated the property employed and the costs incurred in connection with the operations of the company in the District of Columbia and should have fixed the new rates on that basis. It is urged that the Commission had no legal right to consider as a single unit all of the business of the company, including its activities in Maryland and Virginia. It should be observed, however, that this objection is raised by appellants Leeman and Capital Transit Company, but is not advanced by the United States. The objection involves a basic

question of law in the field of rate regulation and requires thorough consideration. The question can be best approached by an examination and analysis of the decisions of the Supreme Court on this point in chronological order.

In Smyth v. Ames, 169 U.S. 466, 541, 18 S.Ct. 418, 432, 42 L.Ed. 819, one of the early decisions in the field of rate regulation, the Court was confronted with the problem of determining the constitutionality of a State statute fixing railway rates. It was contended in behalf of objecting railways that the rates were confiscatory. It was argued in support of the validity of the statute that the reasonableness of the rates was not to be determined by the inquiry whether such rates would leave a reasonable net profit from the local business affected thereby, but that the Court should take into consideration the whole business of the company, interstate and domestic. The Supreme Court, in an opinion by Mr. Justice Harlan, overruled this contention, stating:

"* * * the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business."

In Simpson v. Shepard, (The Minnesota Rate Cases.) 230 U.S. 352, 435, 33 S.Ct. 729, 755, 57 L.Ed. 1511 a similar problem was involved, namely, an attack on rates fixed by a State for intrastate railway traffic. It was claimed that the rates were confiscatory. Mr. Justice Hughes reiterated the doctrine of Smyth v. Ames, supra, and wrote as follows:

"Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates fixed by the state for intrastate transportation affords a fair return must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. * * * The reason, * *, is that the state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business."

In Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 148–151, 51 S.Ct. 65, 68, 75 L. Ed. 255, the Illinois Commerce Commission reduced the local rates of the telephone company for its Chicago business. The company brought suit to enjoin the enforcement of the order claiming that the rates were confiscatory. The Commission had made no distinction between the intrastate and interstate activities of the utility, but reached its conclusions on the basis of the total Chicago property of the company, although a part of it was used for purposes of interstate commerce. The Supreme Court held that the failure to make an allocation of property, costs, and revenues as between the two branches of the business was erroneous. Mr. Chief Justice Hughes wrote as follows on this point:

"The separation of the intrastate and interstate property, revenues and expenses of the company is important not simply as a theoretical allocation to two branches of the business. *It is essential to the appropriate recog-*

*nition of the competent governmental authority in each field of regulation.* (Emphasis supplied.)

\* \* \* \* \* \*

"The proper regulation of rates can be had only by maintaining the limits of state and federal jurisdiction, and this cannot be accomplished unless there are findings of fact underlying the conclusions reached with respect to the exercise of each authority. In view of the questions presented in this case, the validity of the order of the state commission can be suitably tested only by an appropriate determination of the value of the property employed in the intrastate business and of the compensation receivable for the intrastate service under the rates prescribed."

It should be observed that each of the three cases so far reviewed involved a public utility doing both interstate and intrastate business. In each instance the utility challenged rates fixed by state authority for intrastate business, on the ground that the rates were confiscatory. The Court held that the property used and the costs incurred in intrastate business should be segregated in determining whether the rates fixed were adequate. This result was reached on two bases: first, an insufficient rate for intrastate business may not be justified on the theory that it was equalized by more than sufficient income from interstate business; and second, possible conflict between state and federal regulatory authorities must be avoided. In this connection, it is important to bear in mind the admonition of Chief Justice Hughes that, "The proper regulation of rates can be had only by maintaining the limits of state and federal jurisdiction". 282 U.S. at page 149, 51 S.Ct. at page 69, 75 L.Ed. 255.

A shift in the attitude of the Supreme Court on this question was displayed in Wabash Valley Elec. Co. v. Young, 287 U.S. 488, 497–498, 53 S.Ct. 234–236, 77 L.Ed. 447. An Indiana public utility company supplied electric power to a large number of cities and towns within the State, including the city of Martinsville, where the company owned a local plant. The State Commission reduced the rates to be charged for electric service in Martinsville. The Company brought suit to enjoin the enforcement of the order on the ground that the new rates were confiscatory. It was urged by the company that the Commission erred in segregating the value of the property used in connection with the service furnished to Martinsville, and in failing to consider the entire operating property of the company as a unit in fixing the rate base. The Court called attention to the fact that the only question to consider was whether the method adopted by the Commission was constitutional under the due process clause of the Fourteenth Amendment. The Court concluded that the method adopted by the Commission was immune to constitutional attack. In discussing this subject, the Court made the following significant observations:

"*Normally, the unit for rate-making purposes, we may assume, would be the entire interconnected operating property of a utility* used and useful for the convenience of the public in the territory served, without regard to particular groups of consumers or local subdivisions. But conditions may be such as to require or permit the fixing of a smaller unit. (Emphasis supplied.)

\* \* \* \* \* \*

"The three cases last cited recognize that, where the business of a carrier or utility is both interstate and intrastate, the state rates for intrastate transportation or business must be determined by a separate consideration of the value of the property employed in the intrastate business. It is true that there such a separation is made necessary because a different government exercises the rate making power in each of the two fields of regulation, and that situation is wanting here. Nevertheless, the cases furnish a helpful illustration in support of the application of a similar rule in the case now under review."

It should be emphasized that the Supreme Court in this case suggests that normally the unit for rate making purposes should be the entire property of the utility without

regard to geographical subdivisions. The Court recognized that exceptional situations may require a segregation. It would seem to follow that whether such exceptional circumstances exist is to be determined by the administrative body in the exercise of its sound discretion. Here the Court approved the exercise of the discretion of the Commission.

In Lone Star Gas Co. v. State of Texas, 304 U.S. 224, 241, 58 S.Ct. 883, 82 L.Ed. 1304, there was involved an order of a Texas State Commission prescribing the rates for domestic gas supplied by the Lone Star Gas Company to distributing companies in Texas. The company operated pipe lines and sold gas in numerous communities in Texas and Oklahoma. The Texas Commission treated the company property as an integrated system and in that way included the Oklahoma property and operations with the Texas property and activities, in fixing the rates to be charged in Texas. The utility, claiming that the rates were confiscatory, instituted an action to restrain the enforcement of the order. The State insisted that the utility should offer proof to make a segregation as between intrastate and interstate business, and as between Texas and Oklahoma properties and operations. The Supreme Court held that there was no obligation on the part of the company to offer such evidence, and that the company was entitled to present the matter to the Court on the basis on which the Commission had proceeded. The Court further reached the conclusion that the order did not violate the constitutional rights of the company under the commerce clause of the Constitution, art. 1, § 8, cl. 3, because there was no attempt to regulate interstate transportation or sales in interstate commerce. Mr. Chief Justice Hughes observed, 304 U.S. at page 241, 58 S.Ct. at page 891, 82 L.Ed. 1304—"This was not a case where the segregation of properties and business was essential in order to confine the exercise of state power to its own proper province."

This case obviously limits the earlier decisions on this point. It upholds the authority of a State Commission to consider the entire property and all of the operations of the company as a unit even if it operates in two or more States, provided the Commission restricts itself to fixing rates in respect to business over which it has jurisdiction. The doctrine of the earlier decisions is confined to situations in which a segregation of properties and business is essential in order to restrict the exercise of State power to its own proper province as against Federal authority.

In Colorado Interstate Co. v. Federal Power Commission, 324 U.S. 581, 589, 65 S. Ct. 829, 89 L.Ed. 1206, the Federal Power Commission made an order requiring certain natural gas companies to reduce interstate wholesale rates. The companies sought a review of the order. One of the objections raised was the failure of the Commission to separate property used in intrastate business from that used in interstate commerce. The Court considered such a segregation unnecessary. It sustained the action of the Commission. In its opinion it referred to The Minnesota Rate Cases and Smith v. Illinois Bell Tel. Co., supra, but distinguished them on the ground that they involved State regulation of interstate rates of companies doing both an intrastate and interstate business. On this point the Court made the following comments, 324 U.S. at page 589, 65 S.Ct. at page 833, 89 L.Ed. 1206:

"When Congress, as here, fails to provide a formula for the Commission to follow courts are not warranted in rejecting the one which the Commission employs unless it plainly contravenes the statutory scheme of regulation. * * * A separation of properties is merely a step in the determination of costs properly allocable to the various classes of services rendered by a utility. But where as here several classes of services have a common use of the same property difficulties of separation are obvious. Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science."

This review of the leading decisions of the Supreme Court on this point, leads to the following conclusions, which represent the existing law.

█ 1. Normally, the unit for rate making purposes is the entire interconnected operating property of the utility, without regard to geographical subdivisions, although conditions may be such as to require or permit the segregation of a smaller unit.[1]

█ 2. Ordinarily, whether a smaller unit should be used as a basis for rate making, is a matter of discretion for the regulatory agency.[2]

█ 3. An exception is made if a part of the business of the utility is subject to State regulation and part to Federal regulation. In that event, in order to prevent a conflict between State and Federal power, the State in fixing rates must segregate the properties used in the intrastate business and establish intrastate rates on the basis of the segregated properties as a rate base. Similarly, costs must be allocated as between intrastate and interstate business.

4. Such a segregation and allocation are not mandatory if the business of the company is subject to regulation by two or more States, no part of it being subject to Federal supervision.[3]

The appellant relies on a decision of the Court of Appeals for the District of Columbia in Mississippi River Fuel Corp. v. Federal Power Comm., 82 U.S.App.D.C. 208, 163 F.2d 433. True, there are some general statements in the opinion of the Court which, if taken out of their context, seem to make an allocation of costs mandatory. So construed that decision would be inconsistent with the decision of the Supreme Court in Colorado Interstate Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206, which has been previously discussed. An analysis of the opinion, however, especially as it is supplemented by the opinion on a petition for rehearing, irresistibly leads to the conclusion that the Court of Appeals intended no such result. In the opinion on the petition for rehearing, 82 U.S.App.D.C. at page 226, 163 F.2d

at page 451, the Court refers to the allocation of costs as "one of those difficult and delicate balances between federal and state authority, * * *." In other words, the Court was following the principle that segregation is required if a part of the business of the company is subject to state regulation and part to Federal regulation. This is not the case here.

The conclusion is inescapable from the foregoing premises that in this instance the Public Utilities Commission of the District of Columbia was not required to make a segregation as between property used in the District of Columbia business, and that employed in furnishing service in Maryland or Virginia. This case falls within the category of a utility subject to regulation by two or more States. As indicated above, in such a situation no segregation is mandatory.

From a social and economic standpoint, the use of the entire property of the company as a rate base seems sound. The same power house supplies electric current to customers in the District of Columbia and to customers in Maryland and Virginia. A segregation would be purely artificial and, in part at least, arbitrary. Metropolitan areas of large cities located near a State line frequently grow beyond State boundaries. The metropolitan area becomes a unit, and State borders become largely artificial. While in this case some of the current is delivered beyond the urban areas of Maryland and Virginia, this branch of the business is very small. It is argued that District of Columbia customers suffer because the cost of rendering service increases with distance from the power house and with a decrease in density of population. The difference is largely a matter of degree. Some of the urban areas in nearby Maryland served by the company are closer to the principal power house of the company than some sections of the city of Washington. Surely it would not be contended that persons living in Washington a considera-

1. Wabash Valley Elec. Co. v. Young, 287 U.S. 488, 497, 53 S.Ct. 234, 77 L.Ed. 447.

2. Wabash Valley Elec. Co. v. Young, supra; Lone Star Gas Co. v. Texas, 304 U.S. 224, 241, 58 S.Ct. 883, 82 L.Ed.

1304; Colorado Interstate Co. v. Federal Power Commission, 324 U.S. 581, 65 S. Ct. 829, 89 L.Ed. 1206.

3. Lone Star Gas Co. v. Texas, supra.

ble distance from the power house should be charged higher rates than those whose homes are close by. The District of Columbia boundary with recent movements of population becomes very largely a theoretical line, for the metropolitan area of Washington, like the metropolitan areas of many other large cities, is a single unit to all intents and purposes.

A similar result was recently reached by a three-judge statutory court in the Eastern District of Virginia, in reviewing an order of the Interstate Commerce Commission increasing rates of a company that operated buses between Washington and points in nearby Virginia. In that case the Commission failed to segregate intrastate from interstate revenues and expenses, and an objection was made to the refusal of the Commission to do so. The Court overruled this contention in County Board of Arlington County, Va. v. United States, D.C., 101 F.Supp. 328, 331, and made the following comments on this point:

"This argument is not sound. The *inter* and *intra* business are one entire operation, the latter as an integral part of the other. In these circumstances, for rate ascertainments, no separation is helpful. Neither reason nor expediency imposes such an obligation and the law has not."

In view of the foregoing discussion, the Court sustains the action of the Commission in treating the business of the company as a single enterprise and in failing to segregate properties or allocate costs attributable to the part of its business done in the District of Columbia. This ruling disposes of the principal objection to the action of the Commission.

There still remain to be considered the questions whether the conclusions of the Commission are sufficiently supported by findings of fact, and whether the findings of fact are sustained by substantial evidence.

As heretofore stated, the Commission made detailed findings of fact. Criticisms have been advanced to the effect that on some points the findings are not adequate and that, as to others, they are not support-

ed by substantial evidence. A similar objection was made in Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206, but was overruled in the following manner:

"It is contended that the findings of the Commission on the allocation of costs are inadequate and that the cases should be remanded to the Commission so that appropriate findings may be made. The findings of the Commission in this regard leave much to be desired since they are quite summary and incorporate by reference the Commission's staff's exhibits on allocation of cost. But the path which it followed can be discerned. And we do not believe its findings are so vague and obscure as to make the judicial review contemplated by the Act a perfunctory process."

If an occasional ellipsis should be found in the findings, the reasoning followed by the Commission is, nevertheless, clearly disclosed and the omissions, if any, are readily supplied. While the Commission does not separate its opinion from its findings, this course, by a recent amendment to the Federal Rules of Civil Procedure,[4] is permissible in district courts and consequently there is no reason why it should not be allowed to administrative bodies.

In arriving at its finding that the rate base on which the company is entitled to a return is $146,926,000 the Commission adopted the sum of two elements as the capital investment: first, the original cost of the electric plant in service with a deduction for depreciation; and second, the average of the monthly balances in the Materials and Supplies Account. The aggregate amount was reduced by customers' contributions for construction and deposits for the extension of distributing lines. The actual figures are based on testimony of witnesses supported by voluminous and detailed documentary data. In this connection, it must be borne in mind that to a certain degree estimates are necessary and that this item is not subject to a purely

4. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A.

mathematical computation. The Commission not only may, but is in duty bound to use its sound judgment on the basis of the evidence.

Appellants Capital Transit Company and Leeman object to the finding that 5.5% is a fair rate of return to be earned by the company, on the ground that it is not supported by substantial evidence. The United States does not join in this objection. The contention is untenable, inasmuch as there is ample evidence to support the finding.

Dunn, a witness in behalf of the company, analyzed the capital structure and the earnings of the company in great detail and discussed the allocation of its capital as between its funded debt and equity capital. He expressed it as his opinion that earnings of 10.7% on equity capital are necessary to attract new equity capital, while the present rates would produce only about 8.8% return on equity capital. He was of the opinion that 6% would be a fair rate of return on the entire rate base.

McElfresh, a witness in behalf of the Commission, testified that in his opinion a 5.5% return would be sufficient to maintain the company in a sound financial condition and to permit it to attract additional capital. He made a study of market prices of common stock of the company over a period of years, which indicated a range from 16⅝ to 12¾, or an average of 14¾. He concluded that the yield demanded by investors, or the dividend price ratio, varied from 5.4% to 7.1%, the average being 6.1%.

Kosh, an official of the General Services Administration, who testified in behalf of the United States, expressed the view that 5.5% would be a liberal rate of return, and that there was no justification for any return in excess of that. He recommended that the company be placed on a 5.5% basis.

■ Each of the three witnesses supported his opinion by detailed oral testimony and numerous documentary exhibits. Among them were charts showing the Federal Reserve Board index of prices of utilities stocks from 1920 to 1950, and a chart disclosing the ratio of yield on bonds of public utilities during the same period. A more detailed discussion of the evidence would be out of place. The foregoing summary indicates that there is sufficient foundation for the finding of the Commission that 5.5% would be a reasonable rate of return. Again, it must be borne in mind that to a certain extent such a finding involves a question of judgment and opinion, and cannot be based purely on a mathematical calculation.

The finding that an increase of $2,600,000 in earnings per annum was necessary to assure a return of 5.5% on the rate base was reached by taking the following steps. The Commission estimated the aggregate amount that would be necessary to create an income of 5.5% on the rate base. It further estimated what the annual income would be at the existing rates. The difference between the two equaled $2,600,000, which was the amount of additional earnings that would have to be provided. The increased rates were intended to supply this additional sum.

The Commission then made a finding as to how the sum of $2,600,000 should be distributed as among various classes of customers, and directed the company to submit a detailed schedule of rates on that basis. When the new schedule of rates was submitted, the Commission found it to be in substantial compliance with its findings.

Capital Transit Company emphatically urges that the increase charged against it is excessive. On the other hand, appellants Leeman and the United States contend that the increase allocated to the Capital Transit Company should have been even higher. Suffice it to refer to the discussion of the Commission on this point:

"A companion utility company of Pepco; namely, Capital Transit Company, has strenuously opposed any increase in the rates it pays for electric service and has, in fact, contended that Pepco is not in need of any increase in its over-all rates for service to the public. It is the opinion of this Commission such a contention is contrary to the record made, and that adoption of such a view would impose upon Pepco the impossible task of raising substantial sums of money for needed facilities in the face of inadequate earning pow-

er. The record also shows that Capital Transit is not paying a fair price for its electric service. This Commission, naturally, has no desire to impose such additional charges for electric service upon Capital Transit Company as to make it necessary for that Company to apply for a further increase in its own fares for transit service but to remove the discrimination found to exist in the rates it pays requires some increase in charges to it. The additional annual charges against Capital Transit Company prescribed by this order in the opinion of this Commission are just and reasonable and will not prove unduly burdensome. Such charges, however, will operate to alleviate a serious deficiency which presently exists in the rate structure of Pepco."

Again, it must be borne in mind that elements of judgment and opinion must enter into determinations of this type. They are not subject to purely arithmetical calculation.

A number of other objections were raised in respect to the specific rates as fixed by the Commission. All of them have been considered, but they do not seem to require individual discussion. They are obviously matters that are within the discretion of the administrative agency.

The Orders of the Public Utilities Commission for the District of Columbia are affirmed.